# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2010AP3016-CR |
| COMPLETE TITLE: | State of Wisconsin, <br>        Plaintiff-Respondent, <br>    v. <br> Nicolas Subdiaz-Osorio, <br>        Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 345 Wis. 2d 396, 824 N.W.2d 927
(Ct. App. 2012 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 24, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 3, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Kenosha |
| JUDGE: | Mary K. Wagner |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | BRADLEY, J., concurs. (Opinion filed.) CROOKS, J., concurs. (Opinion filed.) ROGGENSACK, ZIEGLER, JJ. concur. (Opinion filed.) ZIEGLER, ROGGENSACK, GABLEMAN, JJJ. Concur. (Opinion filed.) |
| DISSENTED: | ABRAHAMSON, C.J., dissents. (Opinion filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *John A. Pray* and *Frank J. Remington Center, University of Wisconsin Law School*, and oral argument by *Lanny Glinberg*.

For the plaintiff-respondent, the cause was argued by *Daniel J. O'Brien*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

**2014 WI 87**

No. 2010AP3016-CR
(L.C. No. 2009CF149)

STATE OF WISCONSIN     :     IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

    **v.**

**Nicolas Subdiaz-Osorio,**

      **Defendant-Appellant-Petitioner.**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**JUL 24, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 DAVID T. PROSSER, J. This is a review of an unpublished decision of the court of appeals, State v. Subdiaz-Osorio, No. 2010AP3016-CR, unpublished slip op. (Wis. Ct. App. Nov. 15, 2012).

¶2 The case involves the increasingly busy intersection between Fourth Amendment privacy considerations and the constant advancement of electronic technology. The court must determine whether law enforcement officers may contact a homicide suspect's cell phone provider to obtain the suspect's cell phone location information without first securing a court order based

on probable cause.  The court also must consider whether the suspect effectively invoked his right to counsel during an interrogation when he asked <u>how</u> he could get an attorney rather than affirmatively requesting the presence of counsel.

¶3    The homicide here occurred in Kenosha, Wisconsin. After fatally stabbing his brother, Nicolas Subdiaz-Osorio (Subdiaz-Osorio)[1] borrowed his girlfriend's car and fled the scene of the crime.  Kenosha police quickly suspected that Subdiaz-Osorio, who was in the country illegally, was heading for Mexico and carrying the murder weapon.  They marshalled their information and, acting through the Wisconsin Department of Justice, asked Subdiaz-Osorio's cell phone provider to track his cell phone location.  The tracking was successful, and Subdiaz-Osorio was arrested on a highway in Arkansas as he headed south.  Several Kenosha officers promptly went to Arkansas to interrogate the suspect.  Subdiaz-Osorio was questioned in Spanish and given his rights in Spanish.  After the officers explained the extradition process, Subdiaz-Osorio asked how he could get an attorney because he could not afford one.  The officers told him that Arkansas would provide him an attorney if he needed one but then continued to question him. Subdiaz-Osorio later moved to suppress all evidence obtained after his arrest on grounds that the search of his cell phone's

---

[1] This opinion refers to Nicolas Subdiaz-Osorio and his brother, Marco Antonio Ojeda-Rodriguez, by their full hyphenated last names.  For the sake of simplicity, the opinion refers to all other witnesses, other than police officers, by their first names.

location information violated his Fourth Amendment rights and that he was denied his Fifth Amendment right to counsel. He also alleged violations of his rights under the Wisconsin Constitution.

¶4 The Kenosha County Circuit Court, Mary K. Wagner, Judge, denied Subdiaz-Osorio's motions to suppress the evidence obtained after his arrest in Arkansas, accepted his plea to an amended charge, and entered a judgment of conviction for first-degree reckless homicide. The court of appeals affirmed, determining that any error by the circuit court was harmless because it was beyond a reasonable doubt that Subdiaz-Osorio would have entered the same plea even if the evidence obtained after his arrest had been suppressed.

¶5 This case presents two issues for review. First, did law enforcement agents violate Subdiaz-Osorio's Fourth Amendment rights when they procured his cell phone location information without first obtaining a court order[2] based on probable cause? Second, did Kenosha police officers violate Subdiaz-Osorio's Fifth Amendment right to counsel when they continued to interview him after he asked how he could get an attorney?

---

[2] A court order that meets the requirements of the Fourth Amendment may function as a warrant. State v. Tate, 2014 WI 89, ¶2 & n.4, ___ Wis. 2d ___, ___ N.W.2d ___; see also State v. Sveum, 2010 WI 92, ¶39, 328 Wis. 2d 369, 787 N.W.2d 317. However, when a statute provides procedures for obtaining a warrant in a given set of circumstances, law enforcement should follow the statute to ensure that a search conducted under the circumstances contemplated by the statute does not violate a person's Fourth Amendment rights.

¶6    The court is deeply divided on these issues as evidenced by the number of separate writings.

¶7    This opinion is the lead opinion.  It will outline the legal conclusions of the writer, including a mandate that the decision of the court of appeals is affirmed.  Justice Ann Walsh Bradley, Justice N. Patrick Crooks, Justice Patience Drake Roggensack, Justice Annette Kingsland Ziegler, and Justice Michael J. Gableman concur solely in the mandate.

¶8    The following conclusions are my conclusions.

¶9    First, I assume for this case, without deciding the issue, that people have a reasonable expectation of privacy in their cell phone location data and that when police track a cell phone's location, they are conducting a search under the Fourth Amendment.  I make these assumptions to avoid delivering a broad pronouncement about reasonable expectations of privacy in the rapidly developing field of wireless technology.[3]

¶10 Second, even though I assume there was a search in this case and recognize that police did not have a court order when they tracked Subdiaz-Osorio's cell phone location, I conclude that police did have probable cause for a warrant and

---

[3] Justice Ann Walsh Bradley and Justice N. Patrick Crooks believe that tracking a cell phone's location is a search that requires a search warrant.  Chief Justice Shirley S. Abrahamson shares this view in her dissent.

that the exigent circumstances of this case created an exception to the warrant requirement.[4]

¶11 Third, I conclude that Subdiaz-Osorio failed to unequivocally invoke his Fifth Amendment right to counsel when he said, "How can I do to get an attorney here because I don't have enough to afford for one." Subdiaz-Osorio asked how he could get an attorney, which could lead a reasonable officer to wonder whether Subdiaz-Osorio was affirmatively asking for counsel to be present during the custodial interrogation or simply inquiring about the procedure for how to obtain an attorney. See State v. Jennings, 2002 WI 44, ¶¶27-33, 252 Wis. 2d 228, 647 N.W.2d 142. Moreover, Subdiaz-Osorio asked how he could get an attorney immediately after a discussion about the extradition process. The context is important, and the interviewing officers could reasonably believe that Subdiaz-Osorio was asking how to get an attorney for his extradition hearing rather than asking for counsel to be present at the interrogation. Therefore, the interviewing officers did not violate Subdiaz-Osorio's Fifth Amendment rights when they

---

[4] Justice Patience Drake Roggensack, Justice Annette Kingsland Ziegler, and Justice Michael J. Gableman agree that the facts of this case qualify for the exigent circumstance exception to the warrant requirement.

continued to question him after he asked about how he could get an attorney.[5]

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

¶12 In February 2009 Subdiaz-Osorio lived at a trailer park in Kenosha with his brother, Marco Antonio Ojeda-Rodriguez (Ojeda-Rodriguez). Two other men, Liborio DeLaCruz-Martinez (Liborio) and Damien DeLaCruz-Martinez (Damien), lived with the brothers.

¶13 Subdiaz-Osorio was 27 years old and had been living in Kenosha for about two years. The week before the homicide, Subdiaz-Osorio and Ojeda-Rodriguez had argued because their employer had laid off Ojeda-Rodriguez but allowed Subdiaz-Osorio to keep his job. Rankled by Ojeda-Rodriguez's bitterness, Subdiaz-Osorio threatened to stab Ojeda-Rodriguez. Liborio reported that while they were eating in the kitchen, Subdiaz-Osorio held up a steak knife and said that if Ojeda-Rodriguez kept bothering him about being laid off, Subdiaz-Osorio would stab him.

¶14 The bad blood culminated in the late evening and early morning hours of Saturday, February 7 and Sunday, February 8, 2009.[6] Late on February 7, Subdiaz-Osorio and Roberto Gonzales-

---

[5] Justice N. Patrick Crooks, Justice Patience Drake Roggensack, Justice Annette Kingsland Ziegler, and Justice Michael J. Gableman agree that there was no Fifth Amendment Miranda violation in this case. Miranda v. Arizona, 384 U.S. 436 (1966).

[6] Unless otherwise indicated, the events described in this section occurred in 2009.

Carreno (Roberto) had a few beers and called Lanita Mintz (Lanita) to come and dance for them. Lanita knew Subdiaz-Osorio and Ojeda-Rodriguez because the three of them had worked together for approximately four months. Subdiaz-Osorio and Roberto picked up Lanita and brought her to the trailer around 10:45 p.m. The three of them went to Subdiaz-Osorio's bedroom, and Lanita changed into lingerie. Roberto left around 11:20 p.m. At some point after that, Ojeda-Rodriguez tried to force his way into Subdiaz-Osorio's bedroom while Subdiaz-Osorio tried to keep him out. Ojeda-Rodriguez, a former boxer, was heavier than Subdiaz-Osorio and was able to gain entry into the bedroom.

¶15 When Ojeda-Rodriguez entered, he and Subdiaz-Osorio began arguing in Spanish. Lanita could tell that both Subdiaz-Osorio and Ojeda-Rodriguez had been drinking, but because she speaks little Spanish, she could not understand what they said. The argument lasted less than two minutes and ended with Ojeda-Rodriguez punching Subdiaz-Osorio in the face. Subdiaz-Osorio fell into his dresser, then got up to retrieve two knives from his closet. Lanita later testified that Subdiaz-Osorio had a knife in each hand and that he stabbed Ojeda-Rodriguez in the chest after Ojeda-Rodriguez said something aggressive in Spanish and pounded on his chest. As Ojeda-Rodriguez continued to pound his chest, Subdiaz-Osorio lifted one of the knives and brought it down toward Ojeda-Rodriguez's face, cutting him just under the left eye. The blade pierced Ojeda-Rodriguez's left eye socket and entered the right hemisphere of his brain. Ojeda-Rodriguez fell back into the wall, and Subdiaz-Osorio began

kicking him in the face and punching him between kicks. When he stopped beating Ojeda-Rodriguez, Subdiaz-Osorio turned to Lanita and asked her to push one of his teeth back into place because it had probably been dislodged when Ojeda-Rodriguez hit him. Lanita refused, and Subdiaz-Osorio turned back to Ojeda-Rodriguez and punched him two more times. Lanita pushed Subdiaz-Osorio off of Ojeda-Rodriguez and into the doorway.

¶16 After Subdiaz-Osorio left the room, Liborio and Damien arrived and entered the bedroom. Lanita said that Liborio and either Damien or Subdiaz-Osorio carried Ojeda-Rodriguez to Ojeda-Rodriguez's bedroom. As Lanita remembers it, Ojeda-Rodriguez was moving and speaking when she left, but she did not talk with him. She knew Ojeda-Rodriguez was hurt, but she did not think that his wounds were fatal. Lanita arrived home at 1:05 a.m. on February 8. She was the only eyewitness to the stabbing. Although Lanita could recall the event itself, she could not recall what happened to Subdiaz-Osorio's two knives.

¶17 After the stabbing, Subdiaz-Osorio asked Liborio for help bandaging Ojeda-Rodriguez, but when Liborio suggested that they call the police, Subdiaz-Osorio refused and said that he did not want to be arrested. Subdiaz-Osorio then asked his girlfriend, Estella Carreno-Lugo (Estella), to help him take care of Ojeda-Rodriguez. Estella came to Subdiaz-Osorio's trailer and helped bandage Ojeda-Rodriguez's wounds and clean him up. She and Subdiaz-Osorio then left the trailer for her home. Despite Estella's efforts, Liborio found Ojeda-Rodriguez dead the next morning. At 9:27 a.m. on February 8, Liborio,

Damien, and Norma Romero (Norma) reported to the front counter of the Kenosha Safety Building that there had been a stabbing.

¶18 The police found Ojeda-Rodriguez's body battered and stabbed with "purple swelling" on his face and eyes and bandages on his left cheek and shoulder. Emergency Medical Services personnel confirmed that Ojeda-Rodriguez was dead. The medical examiner noted that there was a fatal stab wound under Ojeda-Rodriguez's left eye and two stab wounds on Ojeda-Rodriguez's left shoulder. The fatal stab occurred when Subdiaz-Osorio thrust the knife into Ojeda-Rodriguez's left eye, causing the blade to penetrate Ojeda-Rodriguez's brain three to four inches.

¶19 Detective David May (Detective May) and Detective Gerald Kaiser (Detective Kaiser) became the lead detectives for the investigation. Detective May testified that he learned about the incident about 9:30 a.m. on Sunday, February 8. Several Spanish speaking officers interviewed the three individuals who came to the Safety Building. Officer Ernan DelaRosa arrived at 10:25 a.m. and interviewed Liborio, who said that Subdiaz-Osorio admitted that he had stabbed Ojeda-Rodriguez. Officer Gloria Gonzales arrived at 11:55 a.m. and interviewed Norma. Officer Arturo Gonzalez arrived at 12:06 p.m. and interviewed Damien.

¶20 Officer Pablo Torres[7] (Officer Torres) spoke with Estella around 10 a.m. at her home, and she told him that

---

[7] There is no dispute that Officer Torres speaks Spanish fluently.

Subdiaz-Osorio came to her trailer asking for help because he had stabbed Ojeda-Rodriguez.  Estella gave Subdiaz-Osorio's name to Officer Torres and told him that she allowed Subdiaz-Osorio to borrow her silver Saturn station wagon when he asked for it.  She also gave Officer Torres Subdiaz-Osorio's cell phone number and the license plate number of her car.  Police determined that Subdiaz-Osorio had family living in two communities in nearby Lake County, Illinois, but witnesses also informed the police that Subdiaz-Osorio was in the country illegally, and Estella thought that it was possible that Subdiaz-Osorio was on his way to Mexico, where he also had family.  Officer Torres continued to interview Estella back at the police station until about 12 p.m.  Following up on the information from Estella, the police contacted Subdiaz-Osorio's family in Illinois and determined that they had not heard from him.  Officer Torres believed that since Subdiaz-Osorio's family in Illinois did not know where he was, it was likely he was on his way to Mexico.

¶21 After compiling essential information from the witnesses, the Kenosha police put a temporary want[8] on Subdiaz-

---

[8] A temporary want means "that the suspect was alleged to have committed a felony and should be apprehended promptly, and that there was information sufficient to support an arrest warrant, but that no arrest warrant had yet been issued." State v. Collins, 122 Wis. 2d 320, 322 n.1, 363 N.W.2d 229 (Ct. App. 1984).

Osorio into the Crime Information Bureau (CIB)[9] and National Crime Information Center (NCIC).[10]    CIB is a state system and

---

[9] CIB is part of the Wisconsin Department of Justice's Division of Law Enforcement Services. Crime Information Bureau, Wis. Dep't of Justice, http://www.doj.state.wi.us/dles/cib/crime-information-bureau (last visited July 14, 2014).  CIB "operates and manages the Transaction Information for the Management of Enforcement or TIME System." Time & Technical Unit, Wis. Dep't of Justice, http://www.doj.state.wi.us/dles/cib/time-and-technical-unit (last visited July 14, 2014).

> The TIME/NCIC Systems allow for entry of a wanted person record even if no warrant has been issued in special circumstances.  Agencies that have knowledge by police that a felony was committed and who the person was that committed the felony but no warrant has been issued yet may enter the subject as a wanted person in the Temporary Felony category while the process for obtaining a felony warrant is pursued.

> The want can be entered into CIB only or CIB and NCIC, and the entry remains on file for 48 hours before being automatically purged.  As the entry remains on the system for such a short amount of time, agencies are not allowed to add detainer information to such a record.

TIME System Newsletter Crime Information Bureau, Wis. Dep't of Justice, https://wilenet.org/html/cib/news-time/201211.pdf (Nov. 2012).

[10] NCIC is "an electronic clearinghouse of crime data that can be tapped into by virtually every criminal justice agency nationwide, 24 hours a day, 365 days a year." National Crime Information Center, FBI, http://www.fbi.gov/about-us/cjis/ncic (last visited July 14, 2014).  The FBI operates NCIC in conjunction with other federal, state, local, and tribal criminal justice entities. Id.  For NCIC,

> A "Temporary Felony Want" may be entered when a law enforcement agency has need to take prompt action to establish a "want" entry for the apprehension of a person who has committed, or the officer has reasonable grounds to believe has committed, a felony

11

NCIC is a national system.  The systems work together by sharing information.  To enter information into the CIB and NCIC, the police had to demonstrate probable cause.  The Kenosha police had probable cause to believe Subdiaz-Osorio committed the homicide based on their investigation, and they entered Subdiaz-Osorio's information into the systems.  Together, the CIB and NCIC notified all law enforcement agencies in the country about the temporary want for Subdiaz-Osorio.

¶22 The notification of a temporary want was old technology.  Kenosha police also wanted to track Subdiaz-Osorio's cell phone location to find the vehicle in which he was travelling.  Sometime after 12 p.m., having heard nothing from CIB and NCIC, they contacted the Wisconsin Department of Justice, Division of Criminal Investigation (DCI), and asked DCI to seek information from Sprint Nextel (Sprint), Subdiaz-Osorio's cell phone provider.  DCI filled out and submitted a "Mandatory Information for Exigent Circumstances Requests" form to Sprint.  The description on the form said, "Local law

_____

and who may seek refuge by fleeing across jurisdictional boundaries and circumstances preclude the immediate procurement of a felony warrant.  A "Temporary Felony Want" shall be specifically identified as such and subject to verification and support by a proper warrant within 48 hours following the entry of a temporary want.  The agency originating the "Temporary Felony Want" shall be responsible for subsequent verification or re-entry of a permanent want.

Privacy Act of 1974; Notice of Modified Systems of Records, 64 Fed. Reg. 52343-01 (Sept. 28, 1999).

enforcement homicide suspect.  Believed that suspect will flee the state or the country to avoid prosecution.  Suspect has no ties to Wisconsin.  Suspect considered armed and dangerous. Suspect poses a threat to the public."  DCI requested Subdiaz-Osorio's subscriber information, his call records with cell site information within the past week, his precision location (GPS location), and his real-time Pen Register, Trap & Trace.[11]

¶23  Subdiaz-Osorio's Sprint Nextel Privacy Policy (Policy) contains a "Disclosure of Personal Information" section that reads:

> We disclose personal information when we believe release is appropriate to comply with the law (e.g., legal process, E911 information) . . . or if we reasonably believe that an emergency involving immediate danger of death or serious physical injury

---

[11] According to Wis. Stat. § 968.27(13) (2009-10),

> "Pen register" means a device that records or decodes electronic or other impulses that identify the numbers dialed or otherwise transmitted on the telephone line to which the device is attached.  "Pen register" does not include any device used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by the provider or any device used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business.

Wis. Stat. § 968.27(13) (2009-10).

"'Trap and trace device' means a device that captures the incoming electronic or other impulses that identify the originating number of an instrument or device from which a wire or electronic communication was transmitted."  Wis. Stat. § 968.27(15) (2009-10).

13

to any person requires disclosure of communications or justifies disclosure of records without delay.

"[P]ersonal information" is "information that is directly associated with a person such as his or her name, address, telephone number, e-mail address, activities and preferences." The Policy also refers to Customer Proprietary Network Information (CPNI), which is "information Sprint Nextel obtains or creates when it provides wireline or mobile wireless telecommunications services to a customer." Under the Policy, location information is CPNI and is protected as described in the above block quotation. The Policy informs the subscriber that the "network knows the general location of your phone or wireless device whenever it is turned on." It goes on to say in a section titled "Presence, Location and Tracking Information" that in the event of an emergency, "The law also permits us to disclose the call location of a device on our network without a user's consent . . . ."

¶24 In addition to pursuing the cell phone location information, the police applied for a search warrant to search Subdiaz-Osorio's trailer. Detective Kaiser later stated that it usually takes between two and three hours to draft a search warrant and have it signed by a judge. This case was no different. Kenosha County Circuit Judge Bruce Schroeder issued the search warrant for the trailer on February 8 at 2:37 p.m. Judge Schroeder happened to be in his car when he was called and was able to stop at the police station relatively quickly. After obtaining the warrant, the Kenosha police searched the

14

trailer around 3 p.m.   The police did not find any knives that could have been the murder weapon at the scene of the crime, and thus did not know whether Subdiaz-Osorio had the knives with him.

¶25  Sometime during the afternoon, DCI obtained tracking information for Subdiaz-Osorio's cell phone without obtaining a warrant.   The only information that DCI received from the cell phone provider was location information, not conversations or other data.    After obtaining Subdiaz-Osorio's location information, Detective Kaiser called Arkansas police to inform them that Subdiaz-Osorio was traveling South on I-55 and that the knives used in the murder were never recovered.   Detective Kaiser gave the license plate information, the make, and the model of the car to an Arkansas patrol officer around 5:43 p.m. The Arkansas patrol officer pulled the car over in Luxora, Arkansas around 6:11 p.m. and took Subdiaz-Osorio and Roberto, who was driving the car, into custody.   On the Sunday night he was arrested, Subdiaz-Osorio signed a consent form allowing police to obtain trace evidence from him, including DNA and fingernail clippings.   The Arkansas police did not interrogate him that evening.

¶26  On Monday, February 9, Detective Kaiser traveled to Arkansas with Detective May and Officer Torres.   The Arkansas police obtained a search warrant for the car at 2:34 p.m., and Detective Kaiser processed the car for evidence.

¶27  Officer Torres and Detective May interviewed Subdiaz-Osorio in the Mississippi County Jail in Luxora.   The room was

15

well-lit and roughly eight feet by eight feet in size with a table separating the suspect from the two officers. When Officer Torres entered the interrogation room, he removed Subdiaz-Osorio's handcuffs, and Subdiaz-Osorio accepted a Coke at the beginning of the interview. Subdiaz-Osorio told the police that he preferred that the interview be in Spanish, so that Officer Torres provided translation assistance. Officer Torres believed that Subdiaz-Osorio understood him "very well," and Subdiaz-Osorio never said that he was having trouble comprehending Officer Torres's Spanish. Before speaking with Subdiaz-Osorio, Officer Torres informed Subdiaz-Osorio of his constitutional rights (Miranda[12] warning), and Subdiaz-Osorio signed a waiver form titled "Waiver of Constitutional Rights." Officer Torres read the form written in Spanish, Subdiaz-Osorio read the form himself, and Subdiaz-Osorio signed the form in Officer Torres's presence on February 9 at 3:34 p.m.

¶28 The officers made an audiovisual recording of the interview, portions of which were later played in court and translated contemporaneously from Spanish into English. During the interview, Subdiaz-Osorio asked if Officer Torres would be taking him back to Kenosha, and Officer Torres replied that he and Detective May would not be taking Subdiaz-Osorio back. Officer Torres explained the extradition process:

> We aren't going to take you back to Kenosha. What happens is that you have to appear in front of a judge . . . . And after you appear in front of a

---

[12] Miranda, 384 U.S. 436.

16

judge here in Arkansas then they will find out if there is enough reason to send you back to Kenosha, . . . but we are not going to do that right now. We are not going to know that right now . . . .

Immediately after Officer Torres explained how extradition would work in the above quotation, Subdiaz-Osorio asked, "How can I do to get an attorney here because I don't have enough to afford for one."    Officer Torres responded, "If you need an attorney . . . by the time you're going to appear in the court, the state of Arkansas will get an attorney for you . . . ." Then their interview continued.    Subdiaz-Osorio was very cooperative throughout the interview, which lasted less than an hour.    Although he was cooperative, he did at one point contradict Lanita's version of the stabbing when he claimed that Ojeda-Rodriguez brought a knife into the bedroom and that he disarmed Ojeda-Rodriguez.    After the interview, Officer Torres read a form titled "Consent to Search and Seizure," and Subdiaz-Osorio agreed to give up DNA and trace evidence when he signed the form at 4:12 p.m.

¶29 At no point in the interview in Arkansas did Officer Torres or Detective May threaten, coerce, or make any promises to Subdiaz-Osorio to get him to sign the Waiver of Constitutional Rights or the consent to obtain DNA and trace evidence.

¶30 On February 9, after the police had collected a substantial amount of evidence against him, Subdiaz-Osorio was charged with first-degree intentional homicide contrary to Wis.

17

Stat.    §§ 940.01(1)(a)    (2009-10),[13]    939.50(3)(a),    and
939.63(1)(b).

¶31 Officer Torres and Detective May interviewed Subdiaz-Osorio again on February 22, this time at the Kenosha Police Department, after Subdiaz-Osorio's return to Wisconsin. Again, the officers read Subdiaz-Osorio the Waiver of Rights form, and Subdiaz-Osorio consented and signed it. Subdiaz-Osorio also signed a "Consent to Search" form that allowed the Kenosha police to search his trailer. The Kenosha police applied for and obtained another search warrant for the trailer, but they did not need the warrant because they had Subdiaz-Osorio's consent. On February 22 Subdiaz-Osorio accompanied Detective May, Officer Torres, and other Kenosha police personnel to the scene of the stabbing, and Subdiaz-Osorio walked through and assisted the officers in the investigation. Subdiaz-Osorio described the incident and again claimed that Ojeda-Rodriguez had brought a knife into the bedroom. The officers told Subdiaz-Osorio that his story conflicted with Lanita's account, and Subdiaz-Osorio then admitted that he had procured the knives.

¶32 On April 1, 2009, Subdiaz-Osorio filed a pretrial motion to suppress all statements and evidence that the police

---

[13] All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

obtained after his arrest.[14]  In the suppression motion, Subdiaz-Osorio argued that the warrantless search of his cell phone's location data violated his Fourth Amendment rights, and therefore all evidence obtained after the arrest should be suppressed.  Subdiaz-Osorio also filed a motion challenging the sufficiency of the criminal complaint and the bindover, and he moved to dismiss the information.[15]  On May 14, 2009, Subdiaz-Osorio filed a separate motion to suppress the statements he made during the interrogation in Arkansas, on grounds that Officer Torres failed to properly inform Subdiaz-Osorio of his Miranda rights.

¶33  On June 26, 2009, Judge Wagner denied Subdiaz-Osorio's motion to suppress statements based on the alleged Fourth Amendment violation.  Judge Wagner cited United States v. Forest, 355 F.3d 942 (6th Cir. 2004), vacated sub nom. on other grounds, Garner v. United States, 543 U.S. 1100 (2005), for the proposition that tracking a phone on a public roadway is not a violation of the Fourth Amendment because there is no legitimate expectation of privacy on public roadways.  Alternatively, the

---

[14] It is unclear exactly what evidence the police obtained after Subdiaz-Osorio's arrest.  However, the State filed a "Notice of Intent to Use DNA Evidence at Trial and Summary of Expert Testimony" and attached Laboratory Findings that contained an analysis of blood stains on Subdiaz-Osorio's shoes and pants.  In the DNA analyst's opinion, the blood on Subdiaz-Osorio's shoes and pants belonged to Ojeda-Rodriguez.

[15] In his motion, Subdiaz-Osorio argued that there was no probable cause to suggest he had the requisite intent to kill under Wis. Stat. § 940.01(1)(a).

19

court determined that there were exigent circumstances because an alleged murderer was fleeing and was unpredictable.  The court also denied the motion challenging the sufficiency of the complaint and bindover and refused to dismiss the case. Finally, the circuit court concluded that Officer Torres did not fail to properly inform Subdiaz-Osorio or honor his <u>Miranda</u> rights: Subdiaz-Osorio's question about an attorney was not a request to have an attorney with him during the interview; rather, Subdiaz-Osorio was asking about how he could obtain an attorney for the extradition hearing.

¶34 Therefore, Judge Wagner denied all motions to suppress evidence.  The State filed an amended information on February 15, 2010, charging Subdiaz-Osorio with first-degree reckless homicide by use of a dangerous weapon contrary to Wis. Stat. §§ 940.02(1) and 939.63(1)(b), and Subdiaz-Osorio pled guilty to the charge in the amended information.  The circuit court accepted the plea and found Subdiaz-Osorio guilty of first-degree reckless homicide by use of a dangerous weapon.  On June 28, 2010, the circuit court sentenced Subdiaz-Osorio to 20 years of confinement and 15 years of extended supervision.

¶35 Subdiaz-Osorio appealed the judgment of conviction and the denial of his suppression motion under Wis. Stat. § 971.31(10).[16]   <u>State v. Subdiaz-Osorio</u>, No. 2010AP3016-CR,

---

[16] "An order denying a motion to suppress . . . may be reviewed upon appeal from a final judgment or order notwithstanding the fact that the judgment or order was entered upon a plea of guilty . . . ." Wis. Stat. § 971.31(10).

20

unpublished slip op., ¶2 (Wis. Ct. App. Nov. 15, 2012).   The court of appeals assumed without deciding that the circuit court should have granted the suppression motion.  Id., ¶3.  However, the court determined that any error by the circuit court was harmless because it was beyond a reasonable doubt that Subdiaz-Osorio would have accepted the same plea absent the error.  Id., ¶12.   The court of appeals rejected Subdiaz-Osorio's argument that he could have pursued a self-defense theory if the evidence would have been suppressed inasmuch as Subdiaz-Osorio continued to assault Ojeda-Rodriguez after stabbing him and did not seek medical help.  Id., ¶5.

¶36 The court also rejected the argument that without evidence that he fled to Arkansas, Subdiaz-Osorio could have shown that he did not act with utter disregard for life (a required element of first-degree reckless homicide).  Id., ¶¶6, 9.  According to the court of appeals, Subdiaz-Osorio's flight from Wisconsin and his false statement to the police about Ojeda-Rodriguez bringing one or more knives into his room were not especially important evidence in proving that Subdiaz-Osorio was acting with utter disregard; thus, the failure to suppress that evidence did not significantly impact the State's ability to prove that Subdiaz-Osorio acted with utter disregard.  Id., ¶¶9-11.  Finally, the court of appeals noted that the State had a strong eyewitness account of the murder, and Subdiaz-Osorio received a significant benefit in pleading to first-degree reckless homicide.  Id., ¶12.  Therefore, the court of appeals concluded that any error by the circuit court was harmless

21

beyond a reasonable doubt and affirmed the judgment of conviction. Id.

¶37 Subdiaz-Osorio petitioned this court for review, which we granted on March 13, 2013.

## II. STANDARD OF REVIEW

¶38 Whether law enforcement agents have violated a suspect's Fourth or Fifth Amendment rights is a question of constitutional fact. State v. Phillips, 218 Wis. 2d 180, 189-91, 577 N.W.2d 794 (1998); see State v. Brereton, 2013 WI 17, ¶17, 345 Wis. 2d 563, 826 N.W.2d 369; State v. Sveum, 2010 WI 92, ¶16, 328 Wis. 2d 369, 787 N.W.2d 317. Although the court upholds findings of historical fact unless they are clearly erroneous, constitutional questions are questions of law that this court reviews independently. Brereton, 345 Wis. 2d 563, ¶17; Phillips, 218 Wis. 2d at 189-91. In addition, the court applies a de novo standard of review to "determine whether the historical or evidentiary facts establish exigent circumstances" to justify a warrantless search. State v. Richter, 2000 WI 58, ¶26, 235 Wis. 2d 524, 612 N.W.2d 29 (citation omitted).

## III. DISCUSSION

### A. The Current Privacy Landscape

¶39 This case involves a brutal killing, but the law enforcement effort to apprehend the killer has implications for citizens at large. Thus, I begin my analysis with a general discussion of privacy and citizens' concerns about protecting personal information in an era when technology is chipping away at traditional notions of privacy.

22

¶40 Privacy is a pillar of freedom. There is great value in being able to enter and withdraw from public spaces and disclose the details of our thoughts and movements at our discretion. We share pieces of ourselves with loved ones and bond over the secrets of our identities. We perfect ideas behind closed doors and reveal them to the public when they are ready. We take comfort in seclusion from the world in moments of intimacy. Privacy is not insignificant; it is not something to be taken for granted; and even as it diminishes as our world becomes more interconnected and dangerous, privacy must not become a legal fiction.

¶41 It would be difficult to overstate the value of privacy:

> Privacy is valuable because it is necessary for the proper development of the self, the establishment and control of personal identity, and the maintenance of individual dignity. Without privacy, it not only becomes harder to form valuable social relationships——relationships based on exclusivity, intimacy, and the sharing of personal information——but also to maintain a variety of social roles and identities. Privacy deserves to be protected as a right because we need it in order to live rich, fulfilling lives, lives where we can simultaneously play the role of friend, colleague, parent and citizen without having the boundaries between these different and often conflicting identities breached without our consent.

Stephen E. Henderson, Expectations of Privacy in Social Media, 31 Miss. C. L. Rev. 227, 233 (2012) (quoting Benjamin Goold, Surveillance and the Political Value of Privacy, 1 Amsterdam L. Forum 3, 3-4 (2009)). Thus, privacy serves more than the

individual; it is an integral component of a well-ordered society.

¶42 The privacy landscape is shifting as we embrace new technologies. Electronic devices afford us great convenience and efficiency, but unless our law keeps pace with our technology, we will pay for the benefit of our gadgets in the currency of privacy. As we incorporate more of our lives into our smartphones and tablets, we are not merely using technology as a tool for societal and professional navigation; we are digitizing our identities. Thus, efforts to access the information in our electronic devices invade and expose the marrow of our individuality.

¶43 As Samuel Warren and Louis Brandeis noted presciently well over a century ago, "Recent inventions and business methods call attention to the next step which must be taken for the protection of the person, and for securing to the individual what Judge Cooley calls the right 'to be let alone.'"[17] Perhaps in this age of technology, that right is not as strong as it once was, but it should be our goal to quell its attenuation insofar as it is safe and reasonable to do so. It used to be that "the greatest protections of privacy were neither constitutional nor statutory, but practical." United States v. Jones, 565 U.S. ___, 132 S. Ct. 945, 963 (2012) (Alito, J., concurring). Today, in an environment of rapid technological

---

[17] Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 195 (1890) (footnote omitted).

24

advancement that allows tracking via electronic data, practical limitations on surveillance are quickly dissipating. Technology, it seems, has been irreversibly incorporated into our modern lives. The question we face is whether privacy must be eviscerated to accommodate innovation.

¶44  I believe there is room in the law for both, as well as security. Technology brings with it the danger of criminal opportunism. Thus, at times privacy must make room for security, for privacy is worth little if it is overshadowed by fear. There will be times at which privacy must yield to security in order to thwart crimes, from identity theft to terrorism. The Fourth Amendment often conjures the image of a scale on which we balance the needs of law enforcement and the rights of individuals. Technological innovation does not change the need for balance, but it makes the act of balancing difficult. It is no small task to afford law enforcement officers and government agencies the leeway they need to keep citizens safe while ensuring that citizens retain a reasonable degree of privacy.

¶45 The balancing is especially important as citizens pay close attention to their privacy rights in the context of wireless technology. As awareness of our dwindling privacy increases, surveys consistently reveal that people are apprehensive about losing privacy with regard to their personal

information.[18]  As cell site location and GPS technology become ubiquitous,[19]  Americans are adding cell phone location information to the list of concerns.[20]  This concern makes sense

---

[18] See Vera Bergelson, It's Personal But Is It Mine? Toward Property Rights in Personal Information, 37 U.C. Davis L. Rev. 379, 427-29 (2003) (citing numerous polls in which citizens expressed concerns about their privacy and revealed that they wanted more legal protection for privacy, especially for personal information on the internet).

[19] There are different ways in which cell phone companies, and consequently, the government, can track a cell phone. Providers can obtain a subscriber's location information using global positioning system (GPS) technology or triangulation. GPS technology can calculate an accurate location within 20 meters by "measuring the time it takes for a signal to travel the distance between satellites and a cell phone's GPS chip." Who Knows Where You've Been? Privacy Concerns Regarding the Use of Cellular Phones As Personal Locators, 18 Harv. J.L. & Tech. 307, 308 (2004) [hereinafter Who Knows Where You've Been?]. To locate a phone by triangulation, two or more cell towers that receive signals from an active phone compare the phone's signals and calculate location based on the difference between the times that the signals arrived or the angle of the signals. Id. When a cell phone provider "pings" a phone pursuant to law enforcement's request, the provider enters the phone number in a computer program to make the cell phone identify its GPS coordinates to the provider. United States v. Caraballo, 963 F. Supp. 2d 341, 350 (D. Vt. 2013).

[20] One commentator noted:

Not surprisingly, cell phone users regard access to their location data as yielding private data about their locations.  A research report found that seventy-three percent of cell phone users surveyed favored "a law that required the police to convince a judge that a crime has been committed before obtaining [historical] location information from the cell phone company."

26

as an estimated 335.65 million wireless subscriber connections existed in the United States at the end of 2013.[21]    The court is mindful of the pervasiveness of wireless technology and of our citizens' concern for their privacy as we analyze the constitutional protections against unreasonable government intrusions.

### B. Constitutional Protections of Privacy

¶46   The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[22]    In the event of a Fourth Amendment violation, the usual remedy is suppression of evidence obtained

---

Susan Freiwald, Cell Phone Location Data and the Fourth Amendment: A Question of Law, Not Fact, 70 Md. L. Rev. 681, 744 (2011) (brackets in original) (footnote omitted).    Others have similarly posited that "[w]hile society may be willing to accept the idea of collecting information associated with the origination and termination of calls, people are likely to reject the prospect of turning every cell phone into a tracking device." Who Knows Where You've Been?, supra note 19, at 316.

[21] Annual Wireless Industry Survey, CTIA, http://www.ctia.org/your-wireless-life/how-wireless-works/annual-wireless-industry-survey (last visited July 14, 2014).

[22] The Wisconsin Constitution's text is almost identical to the language in the United States Constitution.

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable

27

in the search.  State v. Ferguson, 2009 WI 50, ¶21, 317 Wis. 2d 586, 767 N.W.2d 187.  However, there are several exceptions to the warrant requirement.  See State v. Krajewski, 2002 WI 97, ¶24, 255 Wis. 2d 98, 648 N.W.2d 385 (noting that exceptions to the warrant requirement include consent and exigent circumstances).  Particularly relevant to this case is the exception for exigent circumstances, which this opinion discusses below.

C. Judicial Interpretations of Constitutional Protections of Privacy

¶47 This case requires the court to consider whether the tracking of Subdiaz-Osorio's cell phone location was a search under the above-quoted constitutional provisions and, if so, whether it required a warrant or was subject to one of the well-delineated exceptions to the warrant requirement.  My analysis keeps in mind Justice Kennedy's caution that: "The judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society

---

searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

Wis. Const. art. I, § 11.  "Historically, we have interpreted Article I, Section 11 of the Wisconsin Constitution in accord with the Supreme Court's interpretation of the Fourth Amendment."  State v. Arias, 2008 WI 84, ¶20, 311 Wis. 2d 358, 752 N.W.2d 748 (citations omitted).  Thus, this opinion will not explicitly address the Wisconsin Constitution in the analysis, but the analysis will apply to both constitutions.

has become clear." City of Ontario, Cal. v. Quon, 560 U.S. 746, 759 (2010) (citing Olmstead v. United States, 277 U.S. 438 (1928), overruled by Katz v. United States, 389 U.S. 347 (1967)).[23]

### 1. Trespassory Searches

¶48 Recent decisions from both the United States Supreme Court and this court have utilized the common law trespass theory to analyze whether a search violated the Fourth Amendment. Case law interpreting the Fourth Amendment "was tied to common-law trespass, at least until the latter half of the 20th century." Jones, 132 S. Ct. at 949 (citations omitted). Recently, the Court has turned again to trespass theory, deciding in Jones that government installation of a GPS tracking device under a suspect's Jeep without a valid warrant was a search because the placement of the device was an impermissible physical intrusion. Id. Trespass theory would not be applicable to the effort to obtain cell phone location information unless one were to deem the cell phone provider's

---

[23] The United States Supreme Court recently issued a decision in Riley v. California, 573 U.S. ___, No. 13-132, slip op. (June 25, 2014), in which it determined that police must obtain a warrant before searching the contents of a cell phone in a search incident to an arrest. Id. at *28. The Court acknowledged that cell phones are capable of containing large quantities of private information, including historical location information, but the Court's decision did not address acquisition of contemporaneous cell phone location information like the tracking of Subdiaz-Osorio's cell phone in this case. See id. at *18 & n.1, 19-20.

29

electronic interaction with Subdiaz-Osorio's cell phone as a physical trespass. Such an analysis would be unnatural.[24]

¶49 This court has not had the opportunity to analyze whether the tracking of cell phones in complete absence of a warrant implicates a suspect's Fourth Amendment rights, but the court has decided that valid warrants may permit GPS tracking of vehicles. See Brereton, 345 Wis. 2d 563, ¶3 (installation of GPS device did not go beyond scope of warrant); Sveum, 328 Wis. 2d 369, ¶74 (warrant for GPS tracking was valid and execution of warrant was reasonable). Although those prior cases involved tracking facilitated by technology, the present case falls under the category of a non-trespassory search and does not benefit from an analysis that relies on the trespass theory of Fourth Amendment searches.

¶50 This court's opinion in State v. Tate, 2014 WI 89, ___Wis. 2d ___, ___ N.W.2d ___, discusses the requirements to obtain a warrant for cell phone location tracking.[25] Tate is

---

[24] See, United States v. Jones, 565 U.S. ___, 132 S. Ct. 945, 953 (2012) ("Situations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."); Marc McAllister, The Fourth Amendment and New Technologies: The Misapplication of Analogical Reasoning, 36 S. Ill. U. L.J. 475, 517-18 (2012) (footnote omitted) (stating that cell phone tracking "does not require the installation of any device; rather, the telephone itself does the work, making the Jones majority's trespass rationale inapplicable.").

[25] During the writing of Tate and this opinion, Governor Scott Walker signed into law 2013 A.B. 536, which requires law enforcement, with some exceptions, to obtain a warrant before obtaining cell phone location information. 2013 Wis. Act 375; see Wis. Stat. § 968.373 (2013-14). The new law went into effect on April 25, 2014.

similar to this case in that it does not involve a trespass. However, Tate focuses on whether the court order there was valid to authorize tracking of the defendant's cell phone location, whereas this case involves an assumed non-trespassory search in the absence of a court order.

### 2. Non-Trespassory Searches

¶51 The Supreme Court expanded the traditional concept of a search in 1967 by extending Fourth Amendment protections to circumstances in which technology enabled an invasion of privacy without a trespass. See Katz, 389 U.S. at 360-61 (Harlan, J., concurring) (determining that regardless of trespass, the Fourth Amendment protects a person's "reasonable expectation of privacy"); see also Jones, 132 S. Ct. at 953 ("Situations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."). In Katz, the government used evidence of the defendant's incriminating phone conversations that the FBI secretly recorded with a device attached to the outside of a public phone booth.[26] Katz, 389 U.S. at 348. Because the defendant had a reasonable expectation of privacy in the phone booth, and because the government failed

---

[26] An anachronism in today's wireless world, the phone booth calls forth both a sense of irony and nostalgia as it sits unassumingly at the center of modern Fourth Amendment jurisprudence.

The virtual elimination of telephone booths and payphones has made it difficult for a citizen away from home to make a telephone call without using a traceable cell phone. Even at home, people today are less reliant on a land line than in the past.

to get a warrant, the FBI's eavesdropping violated the defendant's Fourth Amendment rights. Id. at 353-59.

¶52 Justice Harlan's concurrence set forth a two-part test to determine when a non-trespassory search implicates the Fourth Amendment: (1) the person must have a subjective expectation of privacy; and (2) the expectation of privacy must be "one that society is prepared to recognize as 'reasonable.'" Id. at 361 (Harlan, J., concurring). As the Supreme Court suggested in Jones, Katz offers the proper test to determine whether cell phone location tracking receives Fourth Amendment protection. See Jones, 132 S. Ct. at 953.

3. The Cell Phone Policy and the Subjective Expectation of Privacy

¶53 The State contends that Subdiaz-Osorio did not have a reasonable expectation of privacy in his cell phone location data because his Sprint Policy said that Sprint would disclose location information to law enforcement in the event of an emergency. A recent federal case from Vermont offers an intriguing analysis of a suspect's subjective expectation of privacy based on his cell phone policy. United States v. Caraballo, 963 F. Supp. 2d 341 (D. Vt. 2013).

¶54 In Caraballo, the defendant carried out an execution-style murder when he bound up a woman, shot her in the back of the head, and left her body in the woods. Id. at 343. The victim had been arrested in the past and had told police that she was engaged in drug activity with a man named Frank Caraballo. Id. In her past discussions with police, the victim

32

said that she was very afraid of Caraballo because he would kill her if he knew she was talking to the police, and he had many weapons. Id. Given what they knew about the defendant, the police decided that they would track his cell phone so that they could find and arrest him as quickly as possible. Id. at 345-46. Because time was precious, they did not obtain a warrant. Id.

¶55 Caraballo argued that the warrantless search of his cell phone location data violated his Fourth Amendment rights. Id. at 342. The court went through a variety of analyses but determined that the defendant did not have a reasonable expectation of privacy in his cell phone location data because his Sprint privacy policy informed him that Sprint may disclose personal information in response to emergencies. Id. at 362-63. Hence, the court said, the defendant knew that the police could track him because the situation was an emergency. Id. at 363. Although the facts of Caraballo and the cell phone policy there are similar to the present case, I choose to decide this case on different grounds because total reliance on Subdiaz-Osorio's Policy to decide this case would be problematic.

¶56 First, the Policy in this case is confusing and difficult to interpret. It consists of nine pages that include piecemeal definitions and vague terminology. For example, the Policy creates confusion by defining the term "CPNI" at several

33

different points with varying degrees of specificity.[27]    The definition of CPNI is important because it includes location information, but because the full definition is spread out over several pages, references to CPNI are difficult to understand.

¶57 The Policy is also unclear about what information Sprint will disclose in the event of an emergency.  For example, in a paragraph titled "Protection of Sprint Nextel and Others,"[28] the Policy says that Sprint discloses personal information (of which CPNI is a "special category") if Sprint "reasonably believe[s] that an emergency involving immediate danger of death or serious physical injury to any person requires disclosure of communications or justifies disclosure of records without delay."    (Emphasis added.)    The "communications" language suggests that Sprint will disclose only information related to communications—like phone calls—and there is no attempt to define the "records" that Sprint will disclose.

---

[27] The Policy defines CPNI on pages one and two of the Policy: "CPNI is information Sprint Nextel obtains or creates when it provides wireline or mobile wireless telecommunications services to a customer.  CPNI includes the types of services purchased, how the services are used, and the billing detail for those services."

On page four, the Policy says CPNI "is information about your phone usage, which is a special category of personal information."

Page seven adds to the definition by stating that "Location information derived from providing our voice service . . . is CPNI . . . ."

[28] The title of this paragraph suggests that the disclosure disclaimer is to protect Sprint, not the customer.

¶58  The Policy later says in a section titled "Presence, Location and Tracking Information" that "[l]ocation information derived from providing our voice service, in addition to being covered by this Policy, is CPNI and is protected as described above."  Thus, the full definition of CPNI does not come until after the section that discusses disclosure of CPNI.  Moreover, it is difficult to see how the customer's CPNI is "protected as described above" as the paragraph above enumerates only circumstances in which information will be <u>disclosed</u>.  The "Presence, Location and Tracking Information" section goes on to say that Sprint may disclose "call location" information, but the term "call location," like the phrase "disclosure of communications," misleadingly implies that only location data obtained from a phone call may be disclosed.  It is possible that a customer would read this Policy and understand that his cell phone may be tracked at all times, but that is not the only possible reading.

¶59  In sum, I am reluctant to say that a person loses his reasonable expectation of privacy based on an opaque contract.  The Fourth Amendment is complicated enough without introducing contract interpretation into the calculus.

¶60  Second, even if the Policy clearly provided that Sprint may disclose location information to law enforcement in an emergency, that language merely governs the conduct of

Sprint.[29]  It does not necessarily follow that law enforcement may lawfully seek and obtain the information without a court order or without satisfying the exigent circumstances exception.[30]  Thus, a customer might still reasonably assume that the cell phone company will disclose information only when presented with a valid court order.

¶61 Third, although it is likely that all cell phone policies contain language similar to the Sprint Policy in this case, law enforcement may not know what any given individual's cell phone policy actually says.  It is untenable to contend

---

[29] Wisconsin Stat. § 968.375(15) permits Sprint and other wireless services providers to disclose customer information without a subpoena or warrant if:

> The provider of electronic communication or remote computing service believes in good faith that an emergency involving the danger of death or serious physical injury to any person exists and that disclosure of the information is required to prevent the death or injury or to mitigate the injury.

Wis. Stat. § 968.375(15)(b).  Section 968.375 took effect on May 28, 2010.  The Federal Stored Communications Act also permits a similar disclosure.  18 U.S.C. § 2702(c)(4) (2006) (provider may disclose information "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency").  However, statutes granting cell phone companies authority to disclose information do not necessarily grant law enforcement authority to conduct the search for that information without a court order.

[30] See United States v. Takai, 943 F. Supp. 2d 1315, 1323 (D. Utah 2013) (probable cause and exigent circumstances justified detective's application for cell phone pinging under 18 U.S.C. § 2702).

that a search under the Fourth Amendment depends on the specific language in an individual's cell phone policy——that law enforcement may track a cell phone without a warrant, understanding that if the policy does not alert the suspect that he may be tracked, the search will violate the Fourth Amendment.

¶62 Fourth, the language in Sprint's Policy mirrors the language in the exigent circumstance exception to the warrant requirement.    One example of this exception requires law enforcement to show probable cause and a reasonable belief that there is "a threat to safety of a suspect or others." State v. Hughes, 2000 WI 24, ¶¶19, 25, 233 Wis. 2d 280, 607 N.W.2d 621. The Policy says that Sprint discloses information "if we reasonably believe that an emergency involving immediate danger of death or serious physical injury to any person requires disclosure."    Thus, both the exigent circumstances exception and the Policy contemplate the government obtaining location data where someone's safety is in jeopardy.    However, the exigent circumstances exception contains the additional requirement of probable cause.    I believe it is more appropriate to interpret the Policy as permitting the wireless services provider to disclose information in exigent circumstances rather than saying that the clause nullifies a customer's reasonable subjective expectation of privacy.

¶63 Fifth, interpreting the cell phone policy to eliminate a customer's reasonable subjective expectation of privacy invites law enforcement to be complacent in its requests for tracking.    The Caraballo court noted that Sprint processes

37

thousands of emergency requests each year, and it is Sprint's practice not to second-guess law enforcement's emergency requests. Caraballo, 963 F. Supp. 2d at 349. If law enforcement agents say that there is an emergency, wireless providers apparently give up the location information almost without exception. The deference to law enforcement's tracking requests is not inherently wrong, but requiring police to have probable cause and an exigent circumstance before requesting location data, if they do not have a warrant, diminishes the potential for abuse.

¶64 Finally, I believe it prudent to heed the cautionary advice of the Supreme Court when it comes to determining whether a policy can render an expectation of privacy unreasonable. See Quon, 560 U.S. at 759. In Quon, the Ontario Police Department (OPD) in California distributed to various officers pagers that could send and receive text messages. Id. at 750-51. OPD explicitly informed the officers that messages on the pagers were not private and that the officers should have no expectation of privacy when sending texts on the pagers. Id. at 758. When Police Sergeant Jeff Quon (Quon) challenged the OPD's decision to look at his sexually explicit text messages, claiming a Fourth Amendment violation, the Court decided not to determine whether Quon had a reasonable expectation of privacy in the texts. Id. at 752-53, 760 ("A broad holding concerning employees' privacy expectations vis-à-vis employer-provided technological equipment might have implications for future cases that cannot be predicted. It is preferable to dispose of this

case on narrower grounds."). The Court then assumed Quon had a reasonable expectation of privacy and decided that the special-needs-of-the-workplace exception applied to allow the warrantless search. Id. at 760-61. Because I can avoid a broad pronouncement regarding reasonable expectations of privacy by analyzing this case under the exigent circumstances exception, I need not decide whether Subdiaz-Osorio's cell phone Policy nullified his subjective reasonable expectation of privacy in his cell phone location information.

4. The Objective Reasonableness of the Expectation of Privacy in Cell Phone Location Information

¶65 Despite its apparent simplicity, the Katz test's second prong——whether society is prepared to recognize an expectation of privacy as reasonable——has been the subject of much confusion, debate, and analysis, and it is far from an easy touchstone to apply.[31] See, e.g., California v. Greenwood, 486 U.S. 35, 46-49 (1988) (Brennan, J., dissenting) (disagreeing with the majority about whether respondents had a reasonable expectation of privacy in their trash); Smith v. Maryland, 442 U.S. 735, 747 (1979) (Stewart, J., dissenting) (disagreeing with the majority and suggesting that people have a reasonable expectation of privacy in the phone numbers that they dial).

---

[31] See Orin S. Kerr, Four Models of Fourth Amendment Protection, 60 Stan. L. Rev. 503, 504-05 (2007) (criticizing the numerous, inconsistent tests to determine what society accepts as a reasonable expectation of privacy).

¶66 Although it is difficult to apply, the interpretation of what society is prepared to recognize as a "reasonable expectation of privacy" is an important part of the analysis under Katz. See Florida v. Riley, 488 U.S. 445, 451-52 (1989). In Riley, the Court considered whether police surveillance of a greenhouse from a helicopter 400 feet in the air was a search that required a warrant. Id. at 447-48. A plurality of the Court said that because anyone could have flown a helicopter and observed the top of the greenhouse without violating the law, it was not reasonable for the respondent to expect privacy when he left the top of the greenhouse partially open. Id. at 450-51. Justice O'Connor's concurrence tempered Riley's plurality by emphasizing that the search was not permissible simply because the helicopter complied with FAA regulations or because any citizen could have conducted the same search. Id. at 454-55 (O'Connor, J., concurring). Instead, Justice O'Connor suggested that "consistent with Katz, we must ask whether the helicopter was in the public airways at an altitude at which members of the public travel with sufficient regularity" to determine if the search was "one that society is prepared to recognize as 'reasonable.'" Id. at 454 (quoting Katz, 389 U.S. at 361).

¶67 In accordance with Justice O'Connor's Riley concurrence, the Court later determined that it was presumptively unreasonable for the government to use technology that was not in general public use to conduct a warrantless search that would normally require a physical intrusion of the home subject to the search. Kyllo v. United States, 533 U.S.

40

27, 40 (2001).  In Kyllo, the government's use of thermal imaging to determine whether the defendant's house contained high-intensity lamps used to grow marijuana constituted a search under the Fourth Amendment.  Id. at 29, 40.  The Court concluded that because the government used a thermal imaging device not in general public use to see details inside a house that would normally require a physical intrusion, the warrantless surveillance was an improper search.  Id. at 40.  Kyllo demonstrates that surveillance aided by technology can rise to the level of an impermissible search even absent a physical intrusion.

¶68 Because the concept of an objective reasonable expectation of privacy is elusive, this opinion makes no definitive pronouncement as to whether society is prepared to recognize as reasonable an expectation of privacy in cell phone location data.  Given the widespread apprehension of government intrusion in citizens' electronic personal information, we cannot say that an expectation of privacy in cell phone location data is unreasonable even if it were true that the public is generally aware that cell phone tracking is possible.  On the other hand, cell phone location tracking might be better understood and more prevalent than, say, thermal imaging.  I need not decide the issue of an objective reasonable expectation of privacy on these facts to decide this case.

D. Exigent Circumstances

¶69 Irrespective of whether Subdiaz-Osorio had both a subjective and objective reasonable expectation of privacy in

41

his cell phone location data, and irrespective of whether obtaining that data was a search without a warrant under the Fourth Amendment, I conclude that the tracking of Subdiaz-Osorio's cell phone location fell within the exigent circumstances exception to the warrant requirement. Consequently, the search did not violate Subdiaz-Osorio's Fourth Amendment rights.

¶70 Seeking and obtaining the defendant's cell phone location information is assumed to be a search in this opinion because of the privacy implications. Under the exigent circumstances exception,[32] a warrantless search does not violate a suspect's Fourth Amendment rights if: (1) the government can show that there is probable cause to believe that "evidence of a crime will be found"; and (2) there are exigent circumstances. Hughes, 233 Wis. 2d 280, ¶¶17, 21 (citations omitted). To establish probable cause for a search, the government must show that there is a "'fair probability' that contraband or evidence of a crime will be found in a particular place." Id., ¶21 (citation omitted).

¶71 The probable cause standard also has been employed when there is "probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense." State v. Henderson, 2001 WI 97, ¶19, 245

---

[32] When the exigent circumstances exception applies, a citizen's privacy right "must give way to the compelling public interest in effective law enforcement." State v. Robinson, 2010 WI 80, ¶24, 327 Wis. 2d 302, 786 N.W.2d 463 (citations omitted).

Wis. 2d 345, 629 N.W.2d 613 (quoting Dalia v. United States, 441 U.S. 238, 255 (1979)) (internal quotation marks omitted); see Warden v. Hayden, 387 U.S. 294, 307 (1967).  This formulation may be a more suitable fit for searches of cell phone location information when the primary goal of the search is to obtain information to apprehend the suspect.[33]  "In regard to probable cause, the supreme court has stated that [the Court] deal[s] with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, [must] act." State v. Secrist, 224 Wis. 2d 201, 215, 589 N.W.2d 387 (1999) (quoting State v. Wisumierski, 106 Wis. 2d 722, 739, 317 N.W.2d 484 (1982)) (brackets in original) (internal quotation marks omitted).

¶72  The court determines whether there was probable cause by an objective standard and asks whether the police acted reasonably.[34]  State v. Robinson, 2010 WI 80, ¶26, 327 Wis. 2d 302, 786 N.W.2d 463.  "The core requirement of probable cause

---

[33] The new statute requiring a warrant to track cell phone location information requires "probable cause to believe the criminal activity has been, is, or will be in progress and that identifying or tracking the communications device will yield information relevant to an ongoing criminal investigation." Wis. Stat. § 968.373(3)(e) (2013-14).

[34] "In both an arrest warrant and a search warrant context, probable cause eschews technicality and legalisms in favor of a 'flexible, common-sense measure of the plausibility of particular conclusions about human behavior.'"  State v. Kiper, 193 Wis. 2d 69, 83, 532 N.W.2d 698 (1995) (quoting State v. Higginbotham, 162 Wis. 2d 978, 989, 471 N.W.2d 24 (1991)).

serves to 'safeguard the privacy and security of individuals against <u>arbitrary</u> invasions by government officials.'"  <u>State v. Kiper</u>, 193 Wis. 2d 69, 81, 532 N.W.2d 698 (1995) (emphasis added) (quoting <u>State v. DeSmidt</u>, 155 Wis. 2d 119, 130, 454 N.W.2d 780 (1990)).

¶73 Exigent circumstances exist if, "measured against the time needed to obtain a warrant," and under the facts known at the time, it was objectively reasonable for law enforcement to conduct a warrantless search when: (1) law enforcement was engaged in a "hot pursuit"; (2) there was a threat to the safety of either the suspect or someone else; (3) there was a risk of destruction of evidence; or (4) the suspect was likely to flee. <u>Hughes</u>, 233 Wis. 2d 280, ¶¶24-25 (citing <u>State v. Smith</u>, 131 Wis. 2d 220, 229, 388 N.W.2d 601 (1986)).  The objective exigent circumstances test asks "whether a police officer, under the facts as they were known at the time, would reasonably believe that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of the suspect's escape."  <u>Id.</u>, ¶24 (citing <u>Smith</u>, 131 Wis. 2d at 230).  The State has the burden to prove that exigent circumstances justified the search.  <u>Ferguson</u>, 317 Wis. 2d 586, ¶20.

¶74 Kenosha police had probable cause to conduct a search because there was a "fair probability" that evidence of the stabbing would be found at the location of Subdiaz-Osorio's cell phone.  Eyewitnesses had informed the police that Subdiaz-Osorio had fatally stabbed his brother less than 24 hours before the

44

search and that he had admitted to the stabbing.  Subdiaz-Osorio was now missing but known to have borrowed an automobile.  The murder weapon had not been found.  Subdiaz-Osorio's cell phone had not been located.  There was a fair probability that if Subdiaz-Osorio had his phone, evidence would be found at that location.

¶75  Of course, the police wanted to apprehend Subdiaz-Osorio because of the accumulated evidence they had against him, but the police also had a hope and expectation that Subdiaz-Osorio's apprehension would yield additional evidence of the crime.  This evidence included the defendant's clothing if he was wearing any of the same clothing he wore at the time of the stabbing, the murder weapon if he had not discarded his knives, and his cell phone if he made calls to additional people to whom he made admissions.  The defendant himself could yield DNA evidence and could make inculpatory statements when questioned.  Any person accompanying Subdiaz-Osorio would likely have heard incriminating admissions.  For instance, the driver of the vehicle, Roberto, would surely be asked why he was driving Subdiaz-Osorio south.  Where were they going and why were they going there?  Did they avoid major highways at any point during the trip to avoid detection?  If so, why?

¶76  Given that they had probable cause to track Subdiaz-Osorio's cell phone, the Kenosha police arguably had their pick

of three exigent circumstances.[35]  There was a threat to safety, risk of destruction of evidence, and a likelihood that Subdiaz-Osorio would flee.[36]  The threat to safety and risk of destruction of evidence stem in part from the fact that no murder weapon was ever recovered after Subdiaz-Osorio killed his brother.  It was important to find Subdiaz-Osorio quickly to prevent him from destroying or disposing of his knives and clothes.

¶77 Moreover, it would be difficult to say that a potentially armed individual who recently committed a homicide did not create a threat to safety.  Subdiaz-Osorio argues that stabbing his brother did not automatically support the inference that he was dangerous to others, but police do not have to have conclusive proof that a suspect is likely to harm someone in

---

[35] Wisconsin Stat. § 968.373(8)(a)2. (2013-14) provides an exception to the warrant requirement based on exigency if "[a]n emergency involving danger of death or serious physical injury to any person exists and identifying or tracking the location of the communications device is relevant to preventing the death or injury or to mitigating the injury."

[36] "Hot pursuit" is not at issue in this case because a "hot pursuit" occurs "where there is an immediate or continuous pursuit of [a suspect] from the scene of a crime." State v. Richter, 2000 WI 58, ¶32, 235 Wis. 2d 524, 612 N.W.2d 29 (brackets in original) (citation omitted) (internal quotation marks omitted).  The pursuit of Subdiaz-Osorio was not immediate or continuous.

order to satisfy the exigent circumstances exception. Richter, 235 Wis. 2d 524, ¶40.[37]

¶78 Richter demonstrates that reasonableness is at the center of the exigent circumstances analysis, and in the present case, it was reasonable for the Kenosha police to believe that a potentially armed homicide suspect created an exigent threat to the safety of others. See id. ("[P]ursuit of a suspect known to be armed and dangerous would establish exigent circumstances implicating a threat to physical safety."). Though it is not necessarily required, the police had evidence that Subdiaz-Osorio was armed and dangerous because he had just committed a homicide, and it was likely that he still had the murder weapon. In fact, Subdiaz-Osorio told Liborio that he did not want to be arrested, which could lead a reasonable law enforcement officer to infer Subdiaz-Osorio might become violent if confronted. The Kenosha police had no way of knowing how desperate Subdiaz-Osorio might become to avoid apprehension, or to obtain money or

---

[37] Richter involved a situation in which an eyewitness told police that a burglar fled from her trailer and went into a trailer across the street. Richter, 235 Wis. 2d 524, ¶1. This court determined that even though there was no information to suggest that the burglar was armed or had violent tendencies, the officer could reasonably believe that there was a threat to safety and could conduct a warrantless search of the trailer based on exigent circumstances. Id., ¶¶40-41. A requirement that law enforcement "have affirmative evidence of the presence of firearms or known violent tendencies on the part of the suspect before acting to protect the safety of others is arbitrary and unrealistic and unreasonably handicaps the officer in the performance of one of his core responsibilities." Id., ¶40.

shelter to facilitate escape.  They did know that this was an individual who was dangerous enough to stab someone in the head, and they could reasonably believe that the delay in getting a warrant would seriously endanger life.  Therefore, it was proper for them to conduct a warrantless search to find Subdiaz-Osorio as quickly as possible.

¶79  In addition, the police reasonably could have believed that the likelihood that Subdiaz-Osorio would flee created an exigent circumstance.  The exigent circumstance exception for a fleeing suspect exists if getting a warrant would "greatly enhance the likelihood of the suspect's escape."  Hughes, 233 Wis. 2d 280, ¶24 (citation omitted).  Subdiaz-Osorio was in the country illegally, had just committed a grisly murder, and the police determined that his family in Illinois had not heard from him.  The police knew that he was from Mexico and had family there.[38]  They knew that he had borrowed his girlfriend's car and had warned Liborio that he did not want to be arrested. Therefore, there was a strong inference that he would try to

---

[38] This case calls to mind the situation in State v. Ndina, 2009 WI 21, ¶¶99-102, 315 Wis. 2d 653, 761 N.W.2d 612 (Prosser, J., concurring), in which the defendant booked a flight back to his home country of Albania after stabbing a relative in the neck.  An arrest warrant was obtained, and authorities tried to act quickly before the defendant could fly back to Albania. Even though he spoke almost no English, Ndina evaded capture in the United States and was not apprehended in Albania until several months later.  Id., ¶¶101-02.  The warrant in Ndina was for an arrest, not a search, but that case illustrates how precious time can be when authorities are trying to capture a fleeing suspect.

flee, and time was of the essence to find him before he left the country.

¶80 It is not clear from the record exactly when Subdiaz-Osorio left Kenosha. Clearly, it was before 10 a.m. on February 8, 2009, because the police began to interview Estella by 10 a.m. It was probably before 9:27 a.m. because three of Subdiaz-Osorio's acquaintances went to the Kenosha Safety Building at 9:27 a.m. Kenosha County borders the State of Illinois so that Subdiaz-Osorio would likely have been in Illinois in less than 15 minutes after he left Estella. He probably would have been able to be in Chicago in less than an hour and a half. Chicago provides multiple forms of transportation out of the area besides automobile——airplanes, trains, buses. Chicago also provided the opportunity to buy or rent a different vehicle and buy a different cell phone, perhaps a prepaid cell phone. All this is predicated on Subdiaz-Osorio traveling south rather than north or west. The police could only speculate as to his plans or his route.

¶81 By the time he was arrested at 6:11 p.m. on February 8, Subdiaz-Osorio was in Arkansas, which meant that he had traveled a significant distance since he left that morning. The police could not have known what method of transportation he would use as he attempted to escape or how quickly he would be able to leave the country if that were his goal. Because time was crucial to apprehend a fleeing suspect, the Kenosha police

49

acted properly in the face of exigent circumstances and could not delay to secure an additional warrant.[39]

E. Constitutional Protections Against Self-Incrimination

¶82  In addition to his Fourth Amendment claims, Subdiaz-Osorio argues that Kenosha police violated his Fifth Amendment rights when they continued to question him after he asked about how he could get an attorney.  I conclude that Subdiaz-Osorio's question about obtaining an attorney was equivocal, and Officer Torres did not violate Subdiaz-Osorio's Fifth Amendment rights by continuing to question him.

¶83  The Fifth Amendment to the United States Constitution reads in part: "No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ."[40]  U.S. Const. amend. V.  The Fifth Amendment is the source of the so-called Miranda warnings, which advise a

---

[39] The events in this case occurred on February 7 and 8, 2009, in Kenosha.  The events in Tate occurred on June 9, 2009, in Milwaukee.  This case represents the earliest reported case of cell phone location tracking in Wisconsin.

[40] Similar to the United States Constitution, the Wisconsin Constitution provides, "No person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal case to be a witness against himself or herself."  Wis. Const. art I, § 8(1).  The Wisconsin Constitution has been interpreted to offer the same protection as the United States Constitution's Fifth Amendment when it comes to invoking the right to counsel in a custodial interrogation.  State v. Jennings, 2002 WI 44, ¶¶41-42, 252 Wis. 2d 228, 647 N.W.2d 142.

defendant that he has a right to an attorney, as a means to safeguard his right to remain silent. Miranda v. Arizona, 384 U.S. 436, 467-73 (1966).

¶84 Having been advised of his right to an attorney and his right to remain silent, a suspect in custody must clearly invoke those rights. "[A]fter a knowing and voluntary waiver of the Miranda rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." Davis v. United States, 512 U.S. 452, 461 (1994). "If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." Jennings, 252 Wis. 2d 228, ¶29 (quoting Davis, 512 U.S. at 459). The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id., ¶30 (quoting Davis, 512 U.S. at 459).

¶85 In Davis, the Supreme Court determined that when the suspect said, "Maybe I should talk to a lawyer," it was not an unequivocal request for counsel. Davis, 512 U.S. at 462. This court followed Davis in Jennings and decided that the defendant's statement, "I think maybe I need to talk to a lawyer," was not clear enough to invoke the right to counsel, and the interrogating officers did not have to cease questioning

51

or attempt to clarify what the suspect meant. Jennings, 252 Wis. 2d 228, ¶44.

¶86 In the present case, Subdiaz-Osorio said, "How can I do to get an attorney here because I don't have enough to afford for one." The interview took place in Spanish (so that what we have before us is a translation at the suppression hearing), but it appears as though Subdiaz-Osorio was asking about the process of obtaining an attorney rather than asking for counsel to be present during the interview.

¶87 The context in which Subdiaz-Osorio's question arose is important and a vital element in the totality of the circumstances. Officer Torres had just explained the extradition process to Subdiaz-Osorio and told him that he would have to appear before a judge in Arkansas before a decision on whether he would return to Wisconsin. It was reasonable for Officer Torres to assume Subdiaz-Osorio was asking about how he could get an attorney for his extradition hearing, especially since Subdiaz-Osorio continued to answer questions and remained cooperative for the rest of the interview. In addition, prior to sitting down for the interview, Subdiaz-Osorio signed a waiver of rights form, which Officer Torres had read to him in Spanish. Our case law is clear that it is not enough for a suspect to say something that the interviewer might interpret as an invocation of the right to counsel. Id., ¶29. The invocation of that right must be unequivocal. In this case it was not.

IV. CONCLUSION

52

¶88  Although the court is divided on the rationale for an affirmance, the decision of the court of appeals is affirmed.

*By the Court.*—The decision of the court of appeals is affirmed.

¶89 ANN WALSH BRADLEY, J. *(concurring)*. I agree with the dissent that the tracking of a cell phone constitutes a search in the context of the Fourth Amendment and that the warrantless search here was not justified by exigent circumstances. Dissent, parts I-V. Likewise, I agree that Subdiaz-Osorio's statement was sufficient to invoke his right to counsel. Dissent, part VI.

¶90 However, I part ways with the dissent because, like the court of appeals, I conclude that the circuit court's errors in denying the defendant's suppression motion were harmless. There is no reasonable probability that the circuit court's failure to grant the suppression motion contributed to the conviction. Accordingly, I respectfully concur in the mandate of the lead opinion.

I

¶91 The facts in this case are for the most part uncontested. After a night of drinking the defendant, Subdiaz-Osorio, and his brother, Ojeda-Rodriguez, got into an argument in front of a guest, Mintz, at their trailer. The argument escalated and after his brother punched him, the defendant retrieved a knife and stabbed his brother in the eye. Then, after the brother fell down, the defendant began kicking and punching him in the face. After Mintz pushed Subdiaz-Osorio away from his brother, Subdiaz-Osorio left the room.

¶92 Subdiaz-Osorio asked his roommate, Martinez, for help bandaging Ojeda-Rodriguez. Martinez wanted to call the police, but Subdiaz-Osorio refused and threatened to stab Martinez if he

1

did. Martinez telephoned Carreno-Lugo asking for assistance taking care of Ojeda-Rodriguez. Upon arriving she bandaged him, then she and the defendant went back to her trailer and went to bed. The next morning Martinez found the brother dead. After telling the defendant that his brother was dead and that Martinez was calling the police, Subdiaz-Osorio left.

¶93 Police arrived and found Ojeda-Rodriguez's badly beaten body. When they interviewed Carreno-Lugo, she told them that the defendant asked for help because he had stabbed his brother. He spent the night at her trailer, and after learning his brother was dead, he told her that he had to leave. Careeno-Lugo allowed the defendant to take her car. She told police that he had family in Illinois and Mexico and acknowledged that he might be headed to Mexico.

¶94 After tracking his cell phone, the police located Subdaiz-Osorio in Arkansas. They took trace evidence from him, including DNA. The next day, after officers read the defendant his Miranda[1] rights, he signed a waiver of rights form and agreed to speak without an attorney present. During the interview, the defendant asked if he would be taken back to Kenosha. The officer informed him that he would first have to appear before a judge in Arkansas who would make that determination. At that point the defendant asked "How can I do [sic] to get an attorney here because I don't have enough to afford one?" The officer told him that Arkansas would appoint him a lawyer for the hearing, and continued the interview. At one point during the

_____

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

2

interview, the defendant gave a version of the stabbing, indicating that his brother brought the knife into the room.

¶95 A few weeks later, after the defendant was read his Miranda rights again and signed another waiver of rights form, Subdiaz-Osorio recounted the events of the evening, again indicating that his brother brought the knife. When the officer interviewing the defendant told him that his version of the events conflicted with Mintz's version, the defendant admitted that he had retrieved the knife.

¶96 Subdiaz-Osorio was charged with first-degree intentional homicide. After his suppression motion was denied, Subdiaz-Osorio accepted a plea bargain and pled to a reduced charge of first-degree reckless homicide by use of a deadly weapon. Subdiaz-Osorio now argues that the circuit court erred in failing to suppress the DNA evidence, the location of his apprehension, and his statement in the interview that his brother brought the knife into the room.

II

¶97 In assessing whether a trial error is harmless, we focus on the effect of the error on the jury's verdict. State v. Weed, 2003 WI 85, ¶29, 263 Wis. 2d 434, 666 N.W.2d 485. We have described the test as "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. (quoting State v. Harvey, 2002 WI 93, ¶44, 254 Wis. 2d 442, 647 N.W.2d 189, quoting in turn Neder v. United States, 527 U.S. 1, 15-16 (1999)). To make that determination, "a court must be able to conclude 'beyond a

3

reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" Id. (quoting Harvey, 254 Wis. 2d 442, ¶48 n.14).

¶98 However, in a guilty plea situation following the denial of a motion to suppress, the test for harmless error on appeal is whether there is a reasonable probability that the erroneous admission of the disputed evidence contributed to the conviction. State v. Semrau, 2000 WI App 54, ¶21, 233 Wis. 2d 508, 608 N.W.2d 376; State v. Sturgeon, 231 Wis. 2d 487, 503-04, 605 N.W.2d 589 (Ct. App. 1999). As part of this inquiry, the court considers:

> (1) the relative strength and weakness of the State's case and the defendant's case; (2) the persuasiveness of the evidence in dispute; (3) the reasons, if any, expressed by the defendant for choosing to plead guilty; (4) the benefits obtained by the defendant in exchange for the plea; and (5) the thoroughness of the plea colloquy.

Semrau, 233 Wis. 2d 508, ¶22.

¶99 As an initial matter, neither the court of appeals nor the State addressed Subdiaz-Osorio's arguments relating to the DNA evidence. It is unclear if he previously raised this as evidence he wanted suppressed. In any event, the DNA evidence is not necessary to link him to the crime scene. Subdiaz-Osorio admitted to stabbing his brother and that his asserted defenses were that he acted in self-defense and did not act with utter disregard for human life. Thus, I conclude it is not reasonably probable that this evidence contributed to the conviction.

¶100 The second piece of evidence Subdiaz-Osorio believes should have been suppressed was the fact that he was located in

4

Arkansas. This court has previously determined that evidence of flight has probative value as it tends to show consciousness of guilt. Wangerin v. State, 73 Wis. 2d 427, 437, 243 N.W.2d 448 (1976). In this case, however, even without the evidence that the defendant was found in Arkansas, there was strong evidence against him, including an eyewitness to the stabbing, and other witnesses he spoke with after seeking help. See State v. Quiroz, 2009 WI App 120, ¶28, 320 Wis. 2d 706, 772 N.W.2d 710 (admission of flight evidence harmless error where evidence of guilt was overwhelming).

¶101 To the extent that Subdiaz-Osorio's arrest location indicates flight, it was cumulative of other evidence. As the State asserts, the statements from Carreno-Lugo that Subdiaz-Osorio took her car and was possibly going to Mexico or Illinois, together with his absence from his home, could have independently established that he fled.

¶102 It is also notable that Subdiaz-Osorio received a reduced charge in exchange for his guilty plea. The charge of intentional homicide, which is a class A felony with a maximum sentence of life imprisonment, Wis. Stat. §§ 946.01(a), 939.50(3)(a), was reduced to a charge of reckless homicide, which is a class B felony with a maximum sentence of 65 years imprisonment, Wis. Stat. §§ 940.02(1), 939.50(3)(b), 939.63(1)(b).

¶103 Because Subdiaz-Osorio accepted a reduced plea, in the face of strong evidence against him, including eyewitness testimony and his own confession, I conclude it is not

5

reasonably probable that the circuit court's failure to suppress the location information contributed to the conviction.

¶104 I turn next to the third piece of evidence Subdiaz-Osorio sought to suppress: his initial statement to officers that his brother brought the knife into the room. The harmless error analysis also applies here. State v. Armstrong, 223 Wis. 2d 331, 368-370, 588 N.W.2d 606 (1999) (concluding that the admission of evidence obtained in violation of Miranda was harmless error); State v. Harris, 199 Wis. 2d 227, 263, 544 N.W.2d 545 (1996) (determining that it was harmless error for the court to admit the fruits of a Miranda violation); State v. Rockette, 2005 WI App 205, ¶33, 287 Wis. 2d 257, 704 N.W.2d 382 (determining that regardless of whether a Miranda violation occurred, the error was harmless as the defendant would still have accepted the State's plea deal).

¶105 As with the DNA evidence and the location evidence, the denial of Subdiaz-Osorio's suppression motion with respect to his statement about his brother bringing the knife to the room is also harmless error. As discussed above, the State had a strong case against Subdiaz-Osorio, there was an eyewitness who could testify about who brought the knives, and Subdiaz-Osorio confessed. In exchange for his guilty plea, he received a reduced charge. Accordingly, I conclude that it is not reasonably probable that the circuit court's failure to suppress Subdiaz-Osorio's statements contributed to the conviction.

¶106 In sum, although I determine that the circuit court erred in denying the defendant's motion to suppress, I conclude

6

that the circuit court's errors were harmless. Accordingly, I respectfully concur in the mandate of the lead opinion.

¶107 N. PATRICK CROOKS, J. *(concurring).* In the consolidated cases of <u>Riley v. California</u> and <u>United States v. Wurie</u>, the United States Supreme Court recently recognized that "[m]odern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'the privacies of life.'"[1] By generally requiring a warrant before a cell phone search following an arrest, the Supreme Court unanimously took a definitive approach, which it stated in simple terms: "Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant."[2]

¶108 Our decision in <u>State v. Carroll</u>,[3] a cell phone case, is consistent with the United States Supreme Court's decision in <u>Riley/Wurie</u>. In <u>Carroll</u>, we held that an officer was not justified in searching through images stored on a suspect's cell phone absent a warrant.[4] We reasoned that the images stored on the cell phone were "not in immediate danger of disappearing before [the officer] could obtain a warrant."[5] Like <u>Riley</u>/<u>Wurie</u>,

---

[1] <u>Riley v. California</u>, Nos. 13-132, 13-212, slip op., at *20 (U.S. June 25, 2014) (quoting <u>Boyd v. United States</u>, 116 U.S. 616, 630 (1886)). I will refer to the two consolidated cases as <u>Riley/Wurie</u>.

[2] <u>Id.</u>

[3] <u>State v. Carroll</u>, 2010 WI 8, 322 Wis. 2d 299, 778 N.W.2d 1.

[4] <u>See id.</u>, ¶33.

[5] <u>Id.</u>

1

our decision in Carroll demonstrates a definitive approach, requiring a warrant to search the contents of a cell phone.

¶109 The holdings of the United States Supreme Court in the Riley/Wurie cases and of this court in Carroll lead me to the conclusion that, absent case-specific exceptions, such as an emergency, a warrant is required for the search of a cell phone's location. Therefore, I cannot join the lead opinion. I write separately to express my concern with the broad pronouncements of the lead opinion, especially given that Fourth Amendment cell phone jurisprudence, cell phone technology, and related legislation are all rapidly evolving. However, for the reasons explained below, I would apply a good faith exception consistent with the rationale of State v. Eason[6] and would decline to apply the exclusionary rule here. I agree that the location evidence obtained from Subdiaz-Osorio's cell phone provider should not be suppressed. In addition, I agree that Subdiaz-Osorio did not unequivocally invoke his right to counsel. Therefore, I respectfully concur with the mandate of the lead opinion.

I.

¶110 The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

---

[6] State v. Eason, 2001 WI 98, 245 Wis. 2d 206, 629 N.W.2d 625.

describing the place to be searched, and the persons or things to be seized.[7]

¶111 "As the text makes clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.'"[8] The United States Supreme Court has also "determined that '[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant.'"[9]

¶112 In general, law enforcement should be required to obtain a warrant to search the contents of a cell phone incident to arrest and to obtain location information from a cell phone provider.[10] In addressing the facts of the Wurie case, for example, the United States Supreme Court held that law enforcement was required to obtain a warrant to search a cell phone for information as to the location of the arrestee's

---

[7] U.S. Const. amend IV. In similar language, the Wisconsin Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

Wis. Const. art. I, § 11.

[8] Riley v. California, Nos. 13-132, 13-212, slip op. at *6 (U.S. June 25, 2014) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).

[9] Id. (quoting Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 653 (1995)).

[10] See id.; see also Carroll, 322 Wis. 2d 299.

3

apartment.[11] I see a definite connection between the location information obtained in Wurie and the location information obtained in this case. As the United States Supreme Court explained,

> Data on a cell phone can also reveal where a person has been. Historic location information is a standard feature on many smart phones and can reconstruct someone's specific movements down to the minute, not only around town but also within a particular building. See United States v. Jones, 565 U.S. __, __ (2012) (Sotomayor, J., concurring) (slip op., at 3) ("GPS monitoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious and sexual associations.").[12]

The United States Supreme Court recognized that there is a balancing of interests required when determining whether there should be a definitive rule or some exceptions permitted:

> Absent more precise guidance from the founding era, we generally determine whether to exempt a given type of search from the warrant requirement "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Wyoming v. Houghton, 526 U.S. 295, 300 (1999).[13]

¶113 Therefore, I would hold that law enforcement should obtain a warrant before obtaining cell phone location information from providers.

---

[11] Riley v. California, Nos. 13-132, 13-212, slip op. at *5, 9 (U.S. June 25, 2014).

[12] Id. at *19.

[13] Id. at *9.

4

¶114 I am persuaded that the definitive approach of requiring a warrant for cell phone searches and cell phone location data is appropriate. I recognize that before the Riley/Wurie decisions, other jurisdictions that have considered cases involving cell phone location data have come to differing conclusions concerning a warrant requirement.[14]

¶115 Furthermore, a general warrant requirement is preferable considering the rapid evolution of Fourth Amendment jurisprudence and related legislation in the area of cell phone

---

[14] See Adam Koppel, Note, Warranting A Warrant: Fourth Amendment Concerns Raised by Law Enforcement's Warrantless Use of GPS and Cellular Phone Tracking, 64 U. Miami L. Rev. 1061, 1079 (2010). Compare In re U.S. for an Order Authorizing the Release of Prospective Cell Site Info., 407 F. Supp. 2d 134, 135 (D.D.C. 2006) (holding that the government must demonstrate probable cause in order to obtain cell site tracking information due to Fourth Amendment privacy concerns), and In re Application of the U.S. for an Order (1) Authorizing the Use of a Pen Register & a Trap & Trace Device, 396 F. Supp. 2d 294, 295 (E.D.N.Y. 2005) (holding same), and In re Application of U.S. for an Order Authorizing Installation & Use of a Pen Register & a Caller Identification Sys. on Tel. Nos. (Sealed), 402 F. Supp. 2d 597, 598 (D. Md. 2005) (holding same), and In re Application for Pen Register & Trap/Trace Device with Cell Site Location Auth., 396 F. Supp. 2d 747, 757 (S.D. Tex. 2005) (holding same), with In re U.S. for an Order, 433 F. Supp. 2d 804, 806 (S.D. Tex. 2006) (holding that probable cause was not required for cell site location information), and In re Application of U.S. For an Order, 411 F. Supp. 2d 678, 680 (W.D. La. 2006) (holding same), and In re Application of U.S. for an Order for Prospective Cell Site Location Info. on a Certain Cellular Tel., 460 F. Supp. 2d 448, 462 (S.D.N.Y. 2006) (holding same), and In re Application of U.S. for an Order for Disclosure of Telecomms. Records & Authorizing the Use of a Pen Register & Trap & Trace, 405 F. Supp. 2d 435, 450 (S.D.N.Y. 2005) (holding same).

and other location tracking technology.[15] Justice Alito recognized this very principle when he concurred in part and concurred in the judgment in Riley/Wurie, where he stated:

> In light of these developments, it would be very unfortunate if privacy protection in the 21st century were left primarily to the federal courts using the blunt instrument of the Fourth Amendment. Legislatures, elected by the people, are in a better position than we are to assess and respond to the changes that have already occurred and those that almost certainly will take place in the future.[16]

¶116 It is noteworthy that the Wisconsin Legislature has quite recently enacted[17] Wis. Stat. § 968.373, which generally requires law enforcement to obtain a warrant before "track[ing] the location of a communications device."[18] This statute, however, provides an exception to the general warrant

---

[15] In addition to Riley, the United States Supreme Court has also recently considered questions arising under the Fourth Amendment as they relate to location tracking technology. United States v. Jones, 565 U.S. ___, 132 S. Ct. 945 (2012) (holding that a GPS device placed on an automobile to record the vehicle's location constituted a search under the Fourth Amendment).

[16] Riley v. California, Nos. 13-132, 13-212, slip op. at *22 (U.S. June 25, 2014).

[17] At the time the police obtained the location information at issue here, our case law was not clear as to the need for a warrant, nor were the statutes clear as to the procedures necessary to obtain a warrant, as those procedures are spelled out in the recently enacted provision (Wis. Stat. § 968.373(2)). See Dissent, ¶ ___ n.32; State v. Tate, 2014 WI 89, ¶___ n.33, ___ Wis. 2d ___, ___ N.W.2d ___ (Abrahamson, C.J., dissenting).

[18] Wis. Stat. § 968.373(2) (2011-12) (Effective April 25, 2014).

requirement if "[t]he customer or subscriber provides consent for the action" or if "[a]n emergency involving the danger of death or serious physical injury to any person exists and identifying or tracking the location of the communications device is relevant to preventing the death or injury or to mitigating the injury."[19]  Furthermore, Wis. Stat. §968.373(8)(b) provides guidance to cell phone providers faced with law enforcement requests for location data absent a warrant.[20]  In the fast developing area of Fourth Amendment jurisprudence and emerging technology, I would generally require that law enforcement obtain a warrant to obtain cell phone location data.

¶117 There is no indication that law enforcement lacked the necessary time to obtain a warrant to access Subdiaz-Osorio's cell phone location through information disclosed by his cell phone provider.  Furthermore, nothing suggests that a delay in obtaining a warrant would have hindered law enforcement efforts.  Based on the record in this case, law enforcement could have and

---

[19] Wis. Stat. § 968.373(8)(a).

[20] Wis. Stat. § 968.373(8)(b) (instructing providers to disclose information to law enforcement in situations where customers have provided consent or when the provider has a good faith belief that such information is necessary to prevent death or serious injury).

7

should have obtained a warrant in time to access the requested cell phone location data and apprehend the defendant.[21]

## II

¶118 Despite my view that usually law enforcement must obtain a warrant before obtaining a cell phone location, I would not exclude the location evidence in this case even though law enforcement did not first obtain a warrant. However, I do not agree with the lead opinion's conclusion that the warrantless search was justified on the grounds of probable cause and exigent circumstances. Instead, I would apply a good faith exception in this case to conclude that Subdiaz-Osorio's Fourth Amendment rights were not violated.

¶119 As the United States Court of Appeals for the Fifth Circuit stated:

> [W]e now hold that evidence is not to be suppressed under the exclusionary rule where it is discovered by officers in the course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they are authorized. We do so because the exclusionary rule exists to deter willful or flagrant actions by police, not reasonable, good-faith ones. Where the reason for the rule ceases, its application must cease also.[22]

---

[21] I agree with Chief Justice Abrahamson's dissent that there was sufficient time and information for the police to get a warrant.

[22] United States v. Williams, 622 F.2d 830, 840 (5th Cir. 1980).

¶120 The United States Supreme Court in United States v. Leon[23] recognized the good faith exception to the exclusionary rule in the context of a search based on a subsequently invalidated warrant. However, as a treatise writer has recognized, Leon's sweeping language supports the extension of the good faith exception beyond the warrant situation to non-warrant cases where a police officer's conduct is objectively reasonable:

> Although the holding in both Sheppard and Leon is limited to with-warrant cases, the possibility that these decisions will serve as stepping stones to a more comprehensive good faith exception to the Fourth Amendment exclusionary rule cannot be discounted. Certainly the author of those two decisions, Justice White, was prepared to go farther, as he clearly indicated prior to and contemporaneously with the rulings in those two cases, and some current members of the Court may be equally prepared to take such a step. If they are, much of the reasoning in Leon will offer support for such an extension of that case beyond the with-warrant situation. Particularly noteworthy is the Leon majority's broad assertion that whenever the police officer's conduct was objectively reasonable the deterrence function of the exclusionary rule is not served and that "when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system."[24]

---

[23] United States v. Leon, 468 U.S. 897, 907-08 (1984).

[24] 1 Wayne R. LaFave, Search and Seizure § 1.3(f), at 128 (5th ed. 2012) (citations omitted). See also Wesley MacNeil Oliver, Toward A Better Categorical Balance of the Costs and Benefits of the Exclusionary Rule, 9 Buff. Crim. L. Rev. 201, 270-71 (2005) (advocating a broader application of the good faith exception to cases involving serious crimes wherein the police officers involved reasonably believed probable cause existed for the search or seizure)

¶121 The good faith exception does not contravene the purpose of the exclusionary rule. "When there has been an unlawful search, a common judicial remedy for the constitutional error is exclusion."[25] Specifically, "[t]he exclusionary rule bars evidence obtained in an illegal search and seizure from a criminal proceeding against the victim of the constitutional violation."[26] That the exclusionary rule is a judicially created remedy, not a right, is significant; "its application is restricted to cases where its remedial objectives will best be served."[27]

¶122 Thus, a court considering whether to apply the exclusionary rule must bear in mind the primary purpose of the rule: deterring police misconduct.[28] "[M]arginal deterrence is not enough to justify exclusion; 'the benefits of deterrence must outweigh the costs.'"[29] In employing this type of cost/benefit analysis to the facts of a particular case, a court should recognize the "substantial social costs exacted by the

---

[25] State v. Dearborn, 2010 WI 84, ¶15, 327 Wis. 2d 252, 786 N.W.2d 97.

[26] State v. Ward, 2000 WI 3, ¶46, 231 Wis. 2d 723, 604 N.W.2d 517 (citing Illinois v. Krull, 480 U.S. 340, 347 (1987)).

[27] Dearborn, 327 Wis. 2d 252, ¶35 (citing Herring v. United States, 555 U.S. 135, 129 S.Ct 695, 700 (2009)).

[28] Id., ¶41 (citing Krull, 480 U.S. at 347).

[29] Id., ¶35 (citing Herring, 129 S.Ct at 700).

exclusionary rule for the vindication of Fourth Amendment rights . . . ."[30]  The social costs of deterrence are particularly high where "law enforcement officers have acted in objective good faith or their transgressions have been minor" because "the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system."[31]

¶123 The exclusionary rule is based on a desire to deter law enforcement from violating the constitutional right of a citizen to be free from illegal searches and seizures.  "Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force."[32]  On that basis, we have refused to apply the exclusionary rule where it would otherwise apply where officers proceeded consistent with "law that was controlling at the time of the search,"[33] and where police reasonably relied on a subsequently invalidated search warrant.[34]  We stated specifically, "[T]he laudable purpose of the exclusionary rule——deterring police from making illegal searches

---

[30] Id. at 907.

[31] Id. at 907-908.

[32] State v. Gums, 69 Wis.2d 513, 517, 230 N.W.2d 813 (1975) (quoting Michigan v. Tucker, 417 U.S. 433, 447) (1979).

[33] State v. Ward, 2000 WI 3, ¶3, 231 Wis.2d 723, 604 N.W.2d 517.

[34] Eason, 245 Wis. 2d 206, ¶2.

and seizures——would not be furthered by applying the exclusionary rule."[35]

¶124 That is a guiding principle in the application of the exclusionary rule. We have, consistent with the United States Supreme Court, stressed that "just because a Fourth Amendment violation has occurred does not mean the exclusionary rule applies. . . . The application of the exclusionary rule should focus on its efficacy in deterring future Fourth Amendment violations. Moreover . . . 'the benefits of deterrence must outweigh the costs.'"[36] Citing to Eason, Dearborn made clear that in those circumstances where "the exclusionary rule cannot deter objectively reasonable law enforcement activity, . . . it should not apply . . . ."[37] Many courts have endorsed this approach and have declined to apply the exclusionary rule in a rigid manner where law enforcement acted reasonably.[38]

---

[35] Id.

[36] Dearborn, 327 Wis. 2d 252, ¶35 (citations omitted) (citing Herring v. United States, 555 U.S. 135, 129 S.Ct 695, 700 (2009).

[37] Id., ¶37.

[38] See State v. Coats, 797 P.2d 693, 696 (Ariz. Ct. App. 1990) (discussing Ariz. Rev. Stat. § 13-3925, Arizona's statutory good-faith exception); Toland v. State, 688 S.W.2d 718 (Ark. 1985); Matter of M.R.D., 482 N.E.2d 306, 310 (Ind. Ct. App. 1985); State v. Sweeney, 701 S.W.2d 420, 426 (Mo. 1985); State v. Welch, 342 S.E.2d 789, 795 (N.C. 1986); State v. Gronlund, 356 N.W.2d 144, 146-47 (N.D. 1984); McCary v. Commonwealth, 321 S.E.2d 637, 644 (Va. 1984).

¶125 I agree with that approach, and, based on the record here, this case falls within the category of cases to which the exclusionary rule should not apply because no deterrent purpose would be served by requiring the exclusion of the cell phone location evidence at issue.

¶126 Here police were investigating a murder, and, after pursuing other investigative leads, police contacted the Wisconsin Department of Justice, Division of Criminal Investigation (DCI), and asked DCI to request location information from Subdiaz-Osorio's cell phone provider. Proceeding according to the requirements of the cell phone provider, and pursuant to the terms of its user agreement, DCI filled out and submitted to the cell phone provider a "Mandatory Information for Exigent Circumstances Requests" form. There is no evidence or allegation of police misconduct in this case.

¶127 What occurred here is certainly similar to what we required in structuring the good faith exception:

> We hold that where police officers act in objectively reasonable reliance upon the warrant, which had been issued by a detached and neutral magistrate, a good faith exception to the exclusionary rule applies. We further hold that in order for a good faith exception to apply, the burden is upon the State to show that the process used in obtaining the search warrant included a significant investigation and a review by either a police officer trained and knowledgeable in the requirements of probable cause and reasonable suspicion, or a knowledgeable government attorney. We also hold that this process is required by Article I, Section 11 of the Wisconsin Constitution, in addition to those protections afforded by the good faith

13

exception as recognized by the United States Supreme Court in United States v. Leon, 468 U.S. 897 (1984).[39]

Parallel to our reasoning in Eason, there was a "significant investigation" underway into the murder of Subdiaz-Osorio's brother, including multiple interviews with witnesses and a search warrant executed at his home. Furthermore, as part of the investigation, law enforcement consulted with the Department of Justice, an outside entity certainly "trained and knowledgeable" in these matters, whose staff then requested the cell phone location data. These steps were of a similar nature to the steps outlined in Eason.

¶128 Searches involving cell phone data represent a rapidly evolving area of law where it is appropriate to recognize law enforcement's good faith efforts to conduct investigations consistent with constitutional restrictions. There is no allegation that there was clearly established law that police disregarded in the course of the investigation in this case. The actions of the police here show that the officers were acting in good faith, and, therefore, a good faith exception to the warrant requirement is appropriate here.

¶129 For the reasons stated, I respectfully concur with the mandate of the lead opinion but write separately.

---

[39] Eason, 245 Wis. 2d 206, ¶74.

¶130 PATIENCE DRAKE ROGGENSACK, J. *(concurring).* I agree with the lead opinion's conclusions that law enforcement acted reasonably under the Fourth Amendment due to exigent circumstances and that Subdiaz-Osorio failed to unequivocally invoke his right to counsel. I write in concurrence, however, because I cannot endorse the lead opinion's discussion of whether a search occurred.[1]

¶131 The lead opinion says that it does not decide whether law enforcement's activities constituted a search within the meaning of the Fourth Amendment.[2] It does so in order "to avoid delivering a broad pronouncement about reasonable expectations of privacy in the rapidly developing field of wireless technology."[3] While I wholeheartedly agree with the principles of judicial restraint the lead opinion espouses, I write separately because I believe the lead opinion has "elaborat[ed] too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear."[4] City of Ontario, Cal. v. Quon, 560 U.S. 746, 759 (2010).

¶132 Specifically, while the lead opinion purports to assume without deciding "that people have a reasonable

---

[1] Lead op., ¶¶48-68.

[2] Id., ¶¶9, 64, 68.

[3] Id., ¶9.

[4] As an example of the changing landscape, I note that on April 23, 2014, 2013 Wis. Act 375 was enacted as Wis. Stat. § 968.373 and now governs "tracking the location of a cellular telephone."

1

expectation of privacy in their cell phone location data and that when police track a cell phone's location, they are conducting a search under the Fourth Amendment," it nonetheless applies Katz's two-part test for determining whether a search occurred.[5]  See Katz v. United States, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  In doing so, it seems to decide several points of law that are unrelated to its conclusion, which is grounded in the exigent circumstances exception to the Fourth Amendment's warrant requirement.  Were I writing for the majority of the court, I would write more narrowly, avoiding the conclusions above and also those mentioned below.

¶133 First, the lead opinion concludes that the Subdiaz-Osorio's Sprint policy suffers from multiple legal shortcomings. After noting "piecemeal definitions and vague terminology" in that contract, it concludes that "[i]t is possible that a customer would read th[e] Policy and understand that his cell phone may be tracked at all times, but that is not the only possible reading."[6]  Whether a contract is capable of more than one reasonable interpretation, and is therefore ambiguous, is a question of law that may have important legal ramifications.[7]  I

---

[5] Lead op., ¶¶9, 51-68.

[6] Id., ¶56, 58.

[7] Most commonly, if a statute is ambiguous, meaning "it is capable of being understood by reasonably well-informed persons in two or more senses," we may turn to extrinsic sources, such as legislative history, to aid in our interpretation of a statute.  State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶¶47, 50, 271 Wis. 2d 633, 681 N.W.2d 110.  In the context of contract interpretation, the ambiguous term may be construed against its drafter.  Folkman v. Quamme, 2003 WI 116, ¶20, 264 Wis. 2d 617, 665 N.W.2d 857.

would therefore refrain from interpreting the contract when doing so is unnecessary to our holding.

¶134 The lead opinion further states that even if the cell phone contract were clear, "[i]t does not necessarily follow that law enforcement may lawfully seek and obtain the information without a court order or without satisfying the exigent circumstances exception."[8] It concludes that "a customer might still reasonably assume that the cell phone company will disclose information only when presented with a valid court order."[9]

¶135 This pronouncement calls into serious question the ability of a defendant's voluntary disclosure of information to shape the defendant's expectation of privacy, and therefore questions the continued viability of the third party disclosure doctrine itself, under which a defendant "typically retains no . . . constitutional reasonable expectation of privacy in information conveyed to a third party." ABA Standards for Criminal Justice, Law Enforcement Access to Third Party Records, 6 (3d ed. 2013). This is a developing issue that I believe is better evaluated in a decision that requires us to address third party disclosures. See United States v. Jones, 132 S. Ct. 945, 957 (2012) (Sotomayor, J., concurring) ("it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties").

---

[8] Lead op., ¶60.

[9] Id.

3

¶136 Finally, the lead opinion notes that law enforcement will not know, in each instance, whether a suspect's cell phone contract contains language similar to the Sprint contract in the present case.[10] It then expresses concern that law enforcement will "track a cell phone without a warrant, understanding that if the policy does not alert the suspect that he may be tracked, the search will violate the Fourth Amendment."[11] This will, in turn, "invite[] law enforcement to be complacent in its requests for tracking," according to the lead opinion.[12] As distasteful as that idea may be, I would not evaluate cell phone contract rationales that do not drive our decision.

¶137 In sum, while the lead opinion "believe[s] it prudent to heed the cautionary advice of the Supreme Court" and to decide the case on the narrowest grounds possible, its wide-ranging discussion fails to implement that directive.[13] Instead, its decision all but forecloses argument "that a search under the Fourth Amendment depends on the specific language in an individual's cell phone policy" or that the defendant's disclosure of information to a third party shapes his expectation of privacy.[14] Because I do not wish to decide whether a search occurred in this case, or any of the issues

---

[10] Id., ¶61.

[11] Id.

[12] Id., ¶63.

[13] Id., ¶64.

[14] Id., ¶60-61.

4

that are unnecessary to that inquiry, I do not join the lead opinion, and respectfully concur in its mandate.

¶138 I am authorized to state that Justice ANNETTE KINGSLAND ZIEGLER joins this concurrence.

¶139 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I join Justice Roggensack's concurrence, but write separately to address the United States Supreme Court's recent decision in Riley v. California, 573 U.S. ___, 134 S. Ct. 2473 (2014). Riley addressed whether a warrantless search of the contents of a suspect's cell by police was constitutionally permissible, id. at 2477, while in the case at issue, Subdiaz-Osorio objects to the disclosure of location data by his cell phone service provider. See Lead op., ¶2. The location of a cell phone and the contents contained therein may or may not be subject to the same constitutional analysis. At this point, the parties have not had a reasonable opportunity to brief or argue that point, or address the import of Riley on the case at issue. Especially considering the recent U.S. Supreme Court precedent, I agree with Justice Roggensack, and I would decide this case on the narrowest possible grounds.

¶140 The Riley decision explicitly stated that it was not addressing "the question whether the collection or inspection of aggregated digital information amounts to a search under other circumstances." 134 S. Ct. at 2489 n.1. The Court further clarified that "[o]ur holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search . . . ." Id. at 2493 (emphasis added). The Riley decision acknowledged that "[i]f the police are truly confronted with a now or never situation,——for example, circumstances suggesting that a defendant's phone will be the target of an

1

imminent remote-wipe attempt——they may be able to rely on exigent circumstances to search the phone immediately." Id. at 2487 (citations and internal quotation marks omitted).

¶141 In further limiting its holding to the facts of the case, the Riley court also stated:

> Moreover, even though the search incident to arrest exception does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone. One well-recognized exception applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment. Such exigencies could include the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury. . . .
>
> In light of the availability of the exigent circumstances exception, there is no reason to believe that law enforcement officers will not be able to address some of the more extreme hypotheticals that have been suggested: a suspect texting an accomplice who, it is feared, is preparing to detonate a bomb, or a child abductor who may have information about the child's location on his cell phone. The defendants here recognize——indeed, they stress——that such fact-specific threats may justify a warrantless search of cell phone data. The critical point is that, unlike the search incident to arrest exception, the exigent circumstances exception requires a court to examine whether an emergency justified a warrantless search in each particular case.

Id. at 2494 (citations and internal quotation marks omitted).

¶142 Thus, the Supreme Court in Riley did not necessarily address the specific question presented in the case at issue, presumably because that question was not squarely presented by the facts of Riley. I conclude that, given these uncertainties,

2

we should exercise restraint and cabin our analysis to the facts of this case.

¶143 We have received no briefing or argument on the broader privacy questions that are addressed in the lead opinion or in Riley. As a practical matter, the issue of what actions law enforcement needs to take when seeking cell phone location information has also been addressed by the legislature. See Wis. Stat. §§ 968.373 and 968.375(3)(c) (2013-14).[1] The technological implications of a broader approach are vast and difficult to predict, and we are generally obliged to decide our cases on the "narrowest possible grounds." Barland v. Eau Claire Cnty., 216 Wis. 2d 560, 566 n.2, 575 N.W.2d 691 (1998); see also State v. Robinson, 2010 WI 80, ¶23, 327 Wis. 2d 302, 786 N.W.2d 463. As a result, I join Justice Roggensack's concurrence.

¶144 For the foregoing reasons I respectfully concur.

¶145 I am authorized to state that Justices PATIENCE DRAKE ROGGENSACK and MICHAEL J. GABLEMAN join this concurrence.

---

[1] Wisconsin Stat. §§ 968.373 and 968.375(3)(c) were enacted after the commencement of the case at issue and so are not directly applicable. Our inability to consider the new statutes in this case is an additional argument in favor of a narrow approach.

3

¶146 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting).* "Advances in technology offer great benefits to society in many areas. At the same time, they can pose significant risks to individual privacy rights."[1] The proliferation of cell phones and their location tracking capabilities exemplify the risks to privacy rights posed by technological advancement.

¶147 The criminal cases State v. Tate[2] and State v. Subdiaz-Osorio[3] raise the question whether individuals have a constitutional right of privacy in their cell phone location data. In other words, do the United States[4] and Wisconsin Constitutions[5] permit law enforcement to access a person's cell phone location data without a warrant?

---

[1] State v. Earls, 70 A.3d 630, 631-32 (N.J. 2013).

[2] State v. Tate, 2014 WI 89, ___ Wis. 2d ___, ___ N.W.2d ___.

[3] State v. Subdiaz-Osorio, 2014 WI 87, ___ Wis. 2d ___, ___ N.W.2d ___.

[4] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[5] Article 1, Section 11 of the Wisconsin Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing

1

¶148 Cell phones are a "pervasive and insistent part of daily life . . . ."[6] The vast majority of Americans own cell phones; the Pew Research Center has reported that, as of May 2013, 91% of American adults have a cell phone and 56% have a smartphone.[7] Cell phones are literally and figuratively attached to their users' persons, such that "the proverbial visitor from Mars might conclude they were an important feature of human anatomy."[8] Unlike land-line phones, people generally carry cell phones with them at all times——at home, in the car, at work, and at play.

¶149 Cell phones can thus serve as powerful tracking devices that can pinpoint our movements with remarkable accuracy. They can isolate in time and place our presence at shops, doctors' offices, religious services, Alcoholics Anonymous meetings, AIDS treatment centers, abortion clinics, political events, theaters, bookstores, and restaurants, and

---

the place to be searched and the persons or things to be seized.

[6] Riley v. California, 134 S. Ct. 2473, 2484 (2014).

[7] Earls, 70 A.3d at 638.

[8] Riley, 134 S. Ct. at 2484. The Riley Court additionally noted that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time, with 12% admitting that they even use their phones in the shower." Id. at 2490.

identify with whom the user of the cell phone associates.[9] Cellular service providers have records of the geographic location of almost every American at almost every moment of the day and night.[10] Accessing this information reveals intimate details about a person and intrudes on the constitutional right of association. The United States Supreme Court characterizes location data as "qualitatively different" from physical records, noting that location data can "reconstruct someone's specific movements down to the minute, not only around town but also within a particular building."[11] The more precise the tracking, the greater the privacy concerns.

¶150 Cell phone location data can also be a formidable instrument in fighting crime. In both Tate and Subdiaz-Osorio, the law enforcement officers were performing their important public safety duties by investigating violent crimes. Both criminal suspects were apprehended in relatively short order through law enforcement use of cell phone location data.

¶151 The officers in Tate and Subdiaz-Osorio had to deal with the thorny issues raised by seeking access to individuals'

---

[9] See Earls, 70 A.3d at 632. See also Riley, 134 S. Ct. at 2489 ("Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. . . . [Cell phones] could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.").

[10] See Noam Cohen, It's Tracking Your Every Move and You May Not Even Know, N.Y. Times, Mar. 26, 2011, at A1.

[11] Riley, 134 S. Ct. at 2490 (citing United States v. Jones, 132 S. Ct. 945 (2012) (Sotomayor, J., concurring)).

cell phone location data. Law enforcement is the first word in interpreting constitutional requirements; the courts are the last.

¶152 It is this court's responsibility to evaluate a potential search "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." Wyoming v. Houghton, 526 U.S. 295, 300 (1999).

¶153 This court owes it to law enforcement, lawyers, litigants, circuit courts, the court of appeals, and the public at large to provide clarity about when a search has occurred regarding cell phone location data and what procedures must be undertaken by the government to render such searches constitutional.[12] A clear set of rules will protect privacy interests and also give guidance to individuals evaluating these interests.

¶154 Rather than dance around the issue of whether government access to cell phone location data in the instant cases is a search within the meaning of the Constitutions, I propose that the court address it head-on. Government access to cell phone location data raises novel legal questions of great importance for the privacy rights of the public in an emerging

---

[12] "[W]e promote clarity in the law of search and seizure and provide straightforward guidelines to governmental officers who must apply our holdings." State v. Williams, 2012 WI 59, ¶25, 341 Wis. 2d 191, 814 N.W.2d 460.

area of technology——exactly the type of questions appropriate for resolution pursuant to this court's law-developing function.

¶155 I conclude that government access to cell phone location data in the instant cases, which involves invasive surveillance of an individual's movements, is a search within the meaning of the Constitutions.[13] To read the Constitutions more narrowly is to ignore the vital role that the cell phone has come to play in private communications, to paraphrase the United States Supreme Court in Katz v. United States, 389 U.S. 347, 352 (1967).[14]

¶156 People do not buy cell phones to have them serve as government tracking devices. They do not expect the government to track them by using location information the government gets from cell phones.[15] People have a subjective expectation of privacy in cell phone location data that society is prepared to

---

[13] Justices Ann Walsh Bradley and N. Patrick Crooks agree with this conclusion.

[14] "To read the Constitution more narrowly is to ignore the vital role that the public telephone has come to play in private communication." Katz v. United States, 389 U.S. 347, 352 (1967).

[15] See, e.g., United States v. Davis, ___ F.3d ___, 2014 WL 2599917, at *9 (11th Cir. 2014) ("[I]t is unlikely that cell phone customers are aware that their cell phone providers collect and store historical location information.") (quoting In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. To Disclose Records to Gov't, 620 F.3d 304, 317 (3d Cir. 2010)); Earls, 70 A. 3d at 632.

recognize as reasonable. Thus, absent a warrant, such a search is per se unreasonable.[16]

¶157 If the State does not have a warrant, the State can access cell phone location data only if the State can demonstrate one of the narrowly drawn exceptions to the warrant requirement. In both Tate and Subdiaz-Osorio, law enforcement officers could have accessed cell phone location data with a properly authorized warrant that complied with existing relevant statutes.[17] They did not.

¶158 I address the balance between privacy interests and law enforcement interests as presented by Tate and Subdiaz-Osorio.[18] These two cases address substantially similar issues regarding government access to cell phone location data but pose distinct fact patterns.

¶159 Neither the Tate majority opinion nor Justice Prosser's lead opinion in Subdiaz-Osorio decides whether the government access in question constituted a search within the meaning of the United States and Wisconsin Constitutions. Both opinions assume that a search occurred.

¶160 Despite the insistence of the Tate majority opinion and Justice Prosser's lead opinion in Subdiaz-Osorio that they

---

[16] State v. Sanders, 2008 WI 85, ¶27, 311 Wis. 2d 257, 752 N.W.2d 713; State v. Payano-Roman, 2006 WI 47, ¶30, 290 Wis. 2d 380, 714 N.W.2d 548.

[17] I refer to the court order issued in Tate as a "warrant," as does the Tate majority opinion. The applicable statute refers to a court issuing a "subpoena" requiring the production of documents. Wis. Stat. § 968.135.

[18] "Privacy comes at a cost." Riley, 134 S. Ct. at 2493.

6

merely assume, without deciding, that the government access was a search in each case,[19] both opinions address the search issue as they elaborate on cases and principles underlying their assumption that a search occurred.

¶161 The Tate majority opinion and Justice Prosser's lead opinion in Subdiaz-Osorio refer to and draw guidance from the same Wisconsin and United States Supreme Court cases, including the recently mandated Riley v. California, 573 U.S. ___, 134 S. Ct. 2473 (2014).[20]

¶162 The Tate majority opinion and Justice Prosser's lead opinion announce principles of law that overlap and to an extent

---

[19] Tate, 2014 WI 89, ¶¶2, 26; Subdiaz-Osorio, Justice Prosser's lead op., ¶¶9, 70 (Prosser, J., lead op.). But see Subdiaz-Osorio, Justice Roggensack's concurrence, ¶132 (accusing Justice Prosser's lead opinion of not merely assuming the issue of the reasonable expectation of privacy but in effect deciding the issue).

[20] See Riley, 134 S. Ct. 2473 (cited in Tate, 2014 WI 89, ¶20 n.11; in Subdiaz-Osorio, Justice Prosser's lead op., ¶47 n.23); Katz, 389 U.S. at 353 (cited in Tate, 2014 WI 89, ¶¶19-21; in Subdiaz-Osorio, Justice Prosser's lead op., ¶¶51-52, 65-66; in Subdiaz-Osorio, Justice Roggensack's concurrence, ¶132); Jones, 132 S. Ct. 945 (2012) (cited in Tate, 2014 WI 89, ¶¶17-25; in Subdiaz-Osorio, Justice Prosser's lead op., ¶¶43, 48, 51; in Subdiaz-Osorio, Justice Roggensack's concurrence, ¶135; State v. Brereton, 2013 WI 17, 345 Wis. 2d 563, 826 N.W.2d 369 (cited in Tate, 2014 WI 89, ¶¶16-18, 40; in Subdiaz-Osorio, Justice Prosser's lead op., ¶¶38, 49; State v. Sveum, 2010 WI 92, 328 Wis. 2d 369, 787 N.W.2d 317 (cited in Tate, ¶¶14, 23, 28, 30, 40-43; in Subdiaz-Osorio, Justice Prosser's lead op., ¶49).

7

conflict with each other.[21]  The two opinions, as well as the separate writings in Subdiaz-Osorio of Justices Ann Walsh Bradley, N. Patrick Crooks, and Patience Drake Roggensack, must thus be read together carefully to understand the court's position on the constitutionality of law enforcement access to a person's cell phone location data.[22]

¶163 To address the overlapping issues raised by these two cases, I organize my dissenting opinions as follows.  Each heading number corresponds to the relevant subdivision of each dissent.

¶164 In my dissent in Tate, I address the following main points:

Part I. The police access to the defendant's cell phone location data, an issue in both Tate and Subdiaz-Osorio, was a search within the meaning of the Constitutions.[23]

---

[21] See Subdiaz-Osorio, Justice Roggensack's concurrence, ¶¶131-132 (criticizing Justice Prosser's lead opinion for "elaborate[ing] too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear"); Subdiaz-Osorio, Justice Prosser's lead op., ¶50 (noting that Tate shares similarities with Subdiaz-Osorio even though it is ultimately decided on other issues).

[22] In footnotes 23 through 30, I consolidate and summarize the position of each opinion in Tate and Subdiaz-Osorio regarding particular topics.

[23] For discussions of whether a search existed, see:

Tate, 2014 WI 89, ¶26: Assumes, without deciding, that there was a search.

Subdiaz-Osorio, Justice Prosser's lead op., ¶9: Assumes, without deciding, that there was a search but hints strongly that a search existed.

8

Part II. The search existed as a trespass.[24]

Part III. The search existed as an invasion of an individual's reasonable expectation of privacy.

A. The subjective expectation of privacy was not undermined by:

1. The cell phone contract;[25] or

---

Subdiaz-Osorio, Justice Bradley's concurrence, ¶89; Justice Crooks' concurrence, ¶116: Determine that there was a search.

Subdiaz-Osorio, Justice Roggensack's concurrence, ¶¶131-137: Criticizes Justice Prosser's lead opinion for elaborating too fully on right to privacy in cell phone location data.

Subdiaz-Osorio, Justice Ziegler's concurrence, ¶139-143: Joining Justice Roggensack's concurrence, and requesting additional briefing on whether a search existed.

Tate, 2014 WI 89, ¶61 (Abrahamson, C.J., dissenting): Yes, access to cell phone location data is a search. See also Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶155.

[24] For discussions of whether a trespass existed, see:

Tate, 2014 WI 89, ¶¶18-20: Discusses trespass but refers to the search only as "nontrespassory."

Subdiaz-Osorio, Justice Prosser's lead op., ¶¶48-50: Trespass analysis would be "unnatural."

Tate, 2014 WI 89, ¶¶101-102 (Abrahamson, C.J., dissenting): State does not disclose how information was obtained; appears to be a trespass. See also Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶168.

[25] For discussions of whether the cell phone contract created consent to access the cell phone location data, see:

Tate, 2014 WI 89, ¶22: Defendant might consent through purchase of cell phone.

Subdiaz-Osorio, Justice Prosser's lead op., ¶¶53-63: Consent through cell phone purchase contract was invalid.

9

2. The third-party doctrine.[26]

B. Society recognizes a reasonable expectation of privacy in cell phone location data.[27]

---

Subdiaz-Osorio, Justice Roggensack's concurrence, ¶¶133-135: Questions Justice Prosser's lead opinion regarding contract.

Tate, 2014 WI 89, ¶¶116-121 (Abrahamson, C.J., dissenting): Adhesion contract will not be enforced to waive constitutional rights. See also Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶168.

[26] For discussions of the impact of third-party doctrine, see:

Tate, 2014 WI 89, ¶¶24-25: Third-party doctrine may need reevaluation.

Subdiaz-Osorio, Justice Roggensack's concurrence, ¶134-135: Questions whether expectation of privacy exists in third-party records.

Tate, 2014 WI 89, ¶122-135, (Abrahamson, C.J., dissenting): Third-party doctrine in inapplicable to cell phone location data.

[27] For discussions of whether society recognizes a reasonable expectation of privacy, see:

Tate, 2014 WI 89, ¶¶2, 16-25: Expectation of privacy may be lower for cell phone location, especially in a public area; expectation of privacy was dependent on the cell phone's location in a home.

Subdiaz-Osorio, Justice Prosser's lead op., ¶¶65-68: Public expects privacy in cell phone location data and worries about invasion of privacy.

Subdiaz-Osorio, Justice Roggensack's concurrence, ¶¶134-135: Questions whether expectation of privacy exists in third-party records.

Part IV. Wisconsin Stat. § 968.135, the statute setting forth the requirements for a subpoena of documents, should have been followed——it was not in either Tate or in Subdiaz-Osorio.[28]

¶165 In my dissent in Subdiaz-Osorio, I address two main points:

Part V. The State failed to meet its burden to demonstrate the existence of exigent circumstances;[29] and

---

Tate, 2014 WI 89, ¶136-149 (Abrahamson, C.J., dissenting): Case law, public policy, and Wisconsin legislation point to society recognizing reasonable expectation of privacy in cell phone location data. See also Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶168.

[28] For discussions of the warrant requirement, see:

Tate, 2014 WI 89, ¶¶33-50: Warrant did not comply with Wis. Stat. § 968.135, subpoena for third-party information. Non-statutory warrant met constitutional requirements. Non-statutory warrants met "spirit" of warrant statutes.

Subdiaz-Osorio, Justice Prosser's lead op., ¶5 n.2: No warrant at issue, but warrants must meet Fourth Amendment and statutory requirements.

Subdiaz-Osorio, Justice Bradley's concurrence, ¶89: A warrant was needed and the State's warrant failed to comply in either case.

Subdiaz-Osorio, Justice Crooks' concurrence, ¶118: A warrant was needed but the good-faith exception applied.

Tate, 2014 WI 89, ¶¶150-163 (Abrahamson, C.J., dissenting): State fails to comply with statutory warrant requirements. Warrant was invalid. See also Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶168.

[29] For discussions of exigent circumstances, see:

Tate: Exigent circumstances not at issue.

11

Part VI. The defendant invoked his Miranda right to an attorney at his interrogation.[30]

¶166 My discussion in Parts I-IV of my Tate dissent is relevant to Subdiaz-Osorio, and I incorporate Parts I-IV of my Tate dissent into my Subdiaz-Osorio dissent without repeating

---

Subdiaz-Osorio, Justice Prosser's lead op., ¶¶69-81: Exigent circumstances exception to warrant requirement was satisfied.

Subdiaz-Osorio, Justice Bradley's concurrence, ¶89: there were no exigent circumstances.

Subdiaz-Osorio, Justice Crooks' concurrence, ¶118: there were no exigent circumstances.

Subdiaz-Osorio, Justice Roggensack's concurrence, ¶130: Law enforcement acted reasonably under the Fourth Amendment due to exigent circumstances.

Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶169-208: State fails to meet its burden to show exigent circumstances.

[30] For discussions of the Miranda right to an attorney, see:

Tate: Miranda rights not at issue.

Subdiaz-Osorio, Justice Prosser's lead op., ¶¶82-87: Defendant failed to invoke unequivocally right to an attorney.

Subdiaz-Osorio, Justice Bradley's concurrence, ¶89: Defendant successfully invoked Miranda right.

Subdiaz-Osorio, Justice Crooks' concurrence, ¶109; Justice Roggensack's concurrence, ¶130: Defendant failed to invoke unequivocally right to an attorney.

Subdiaz-Osorio, Chief Justice Abrahamson's dissent, ¶¶209-219: A reasonable person would understand Subdiaz-Osorio to have invoked his Miranda right.

them in full. Parts V and VI address issues found only in my Subdiaz-Osorio dissent.[31]

¶167 Accordingly, I dissent in both cases.

I-IV

¶168 Parts I-IV of my dissent in Tate constitute Parts I-IV of this dissent. In other words, I incorporate by reference Parts I-IV of the Tate dissent. See Tate, 2014 WI 89, ¶¶52-163 (Abrahamson, C.J., dissenting).

V

¶169 Law enforcement did not obtain a warrant for the defendant's cell phone location data in Subdiaz-Osorio. Warrantless searches are "per se unreasonable under the Fourth

---

[31] The two cases raise numerous additional issues that I do not address, including the applicability of federal statutes, the good-faith exception, and the proper standard for reviewing and remedying an illegal search of cell phone location data.

Justice Crooks' concurrence in Subdiaz-Osorio asserts that an illegal warrantless search occurred, Justice Crooks' concurrence, ¶¶125-128, but that the good-faith exception applies, and that the evidence should not have been excluded. As I explain in Parts I-IV, our state's case law already set forth the need for a warrant and the statutes provide procedures for obtaining a warrant. These rules of law existed at the time that the officers initiated the search in the instant cases.

I am unconvinced that the usual harmless-error analysis is the proper approach in Tate and Subdiaz-Osorio. See Subdiaz-Osorio, Justice Bradley's concurrence, ¶¶97-105 (applying harmless-error analysis in Subdiaz-Osorio). When illegally obtained cell phone location data forms the entire basis for the apprehension and arrest of the defendant, rather than evidence of the crime, the usual harmless-error analysis appears to be a poor fit.

13

Amendment . . . ."[32] of the United States Constitution and under the Wisconsin Constitution.

¶170 The government bears the burden of proving by clear and convincing evidence that a warrantless search falls within one of the narrowly delineated exceptions to the warrant requirement.[33] One such exception is exigent circumstances.

¶171 By definition, exigent circumstances justifying an exception to the warrant requirement must be exceptional; the circumstances must generate a sense of urgency. Furthermore, the particular warrantless search must be justified by weighing "the urgency of the officer's need to [search] against the time needed to obtain a warrant." State v. Richter, 2000 WI 58, ¶28, 235 Wis. 2d 524, 612 N.W.2d 29.

¶172 In order to show that an urgent situation existed and that there was no time to secure a warrant, "[t]he officer must be able to point to specific and articulable facts which, taken with rational inferences from those facts," constitute grounds to believe an emergency existed and there was a need to act.[34] Each case must be decided on its facts, not on a court's acceptance of overgeneralizations.[35]

---

[32] Sanders, 311 Wis. 2d 257, ¶27.

[33] Payano-Roman, 290 Wis. 2d 380, ¶30; State v. Kieffer, 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998).

[34] 3 Wayne R. LaFave, Search and Seizure, § 6.6(a), at 599 (5th ed. 2013) (citation and quotations omitted).

[35] Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552, 1561 (2013) (citing Richards v. Wisconsin, 520 U.S. 385, 393 (1997) (blanket rules cannot be used to justify a lack of a warrant)).

¶173 The State failed to demonstrate that any of the three purported circumstances advanced by Justice Prosser's lead opinion——threat to safety, risk of destruction of evidence, and increased likelihood of flight[36]——existed with sufficient urgency to justify the privacy violation in the instant case. To get around the State's paucity of evidence in the record to support urgency, Justice Prosser's lead opinion engages in the type of overgeneralizations condemned by Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552, 1561 (2013).

¶174 In most criminal investigations, at least one of these three purported circumstances exist. If the mere allegation of one of these circumstances is sufficient to demonstrate exigent circumstances, an officer could simply presume exigent circumstances in most cases. Justice Prosser's lead opinion's holding allows the exigent circumstances exception to swallow the warrant requirement in the present case.

¶175 In addition to its failure to show urgency, the State also failed to show that there was not sufficient time to get a warrant under the circumstances.

¶176 Because the State failed to meet its burden to prove exigent circumstances, I dissent. Justice Bradley and Justice Crooks agree that in the instant case, the State failed to demonstrate exigent circumstances to justify an exception to the warrant requirement.[37]

---

[36] Lead op., ¶76.

[37] See Justice Bradley's concurrence, ¶89; Justice Crooks' concurrence, ¶118.

15

A

¶177 In the instant case, the State entered no evidence that alleged exigencies posed the urgent threat necessary to justify the warrantless search in question.

¶178 Justice Prosser's lead opinion relies on three exigent circumstances: (1) "a threat to safety"; (2) "risk of destruction of evidence"; and (3) "a likelihood that [the defendant] would flee." Lead op., ¶76.

¶179 First, Justice Prosser's lead opinion states that because the murder weapon (a knife) was not recovered, "a potentially armed individual who recently committed a homicide" created a "threat to safety." Lead op., ¶77.

¶180 I agree that a threat to safety exists when an armed and dangerous suspect is at large, but not every suspect believed to be armed and dangerous poses an exigent circumstance.

¶181 State v. Richter, 2000 WI 58, 235 Wis. 2d 524, 612 N.W.2d 29, is instructive. In Richter, the court held that an imminent threat to safety existed when an officer knew that one home had been burglarized, had evidence that the suspect had fled to a second home, observed signs of forced entry into that home, and saw that there were people sleeping inside the second home at the time the intruder entered. Richter, 235 Wis. 2d 524, ¶41. This combination of factors "creat[ed] a situation fraught with potential for physical harm if something was not immediately done to apprehend the suspect." Richter, 235 Wis. 2d 524, ¶41 (emphasis added).

16

¶182 Conversely, in the instant case, there was no such immediate threat. The police could identify only a generalized threat that exists any time a suspect is believed to be armed and is sought on suspicion of having committed a violent offense. If exigent circumstances exist any time a suspect is armed and is under suspicion of having committed a violent offense, exigent circumstances would exist in most criminal investigations and the warrant requirement would be rendered a nullity.

¶183 Justice Prosser's lead opinion bases its determination that a "threat to safety" existed here on pure speculation and conjecture, repeatedly citing information that the police "had no way of knowing." Lead op., ¶78. The police had no way of knowing or even inferring, as Justice Prosser's lead opinion supposes, "that [the defendant] might become violent if confronted," or "how desperate [the defendant] might become to avoid apprehension." Id.

¶184 Second, Justice Prosser's lead opinion asserts that there was a "risk of destruction of evidence." Lead op., ¶76. For this proposition, Justice Prosser's lead opinion offers no reasonable or articulable facts, because none were offered by the State. Nothing in the record demonstrates an imminent

threat of destruction of evidence.[38] Unlike other cases in our jurisprudence, there were no signs of evidence being destroyed,[39] or particular facts to support an officer's suspicion of the destruction of evidence.[40]

¶185 Third, Justice Prosser's lead opinion asserts that there was "a likelihood that [the defendant] would flee." Lead op., ¶76. The defendant was no longer at the scene. The police knew the following: the suspect had already fled; the suspect had family in Mexico; and the suspect had told a friend that he did not want to be arrested.

¶186 Criminal suspects are often no longer at the scene of a crime when law enforcement officers arrive. Criminal suspects often have family and friends in places other than the place of the crime. Criminal suspects can usually access various forms of transportation. Criminal suspects rarely intend to be arrested.

---

[38] See McNeely, 133 S. Ct. at 1559 ("[I]n some circumstances law enforcement officers may conduct a search without a warrant to prevent the imminent destruction of evidence.") (emphasis added); id. at 1569 (Roberts, C.J., concurring, joined by Breyer, J. & Alito, J.) ("[The exigent circumstances exception] applies when there is a compelling need to prevent the imminent destruction of important evidence, and there is no time to obtain a warrant.") (emphasis added).

[39] See, e.g., State v. Hughes, 2000 WI 24, ¶26, 233 Wis. 2d 280, 607 N.W.2d 621; State v. Robinson, 2010 WI 80, ¶31, 327 Wis. 2d 302, 786 N.W.2d 463 (in which such signs appeared).

[40] See State v. Meyer, 216 Wis. 2d 729, 751-53, 576 N.W.2d 260 (1998) ("[P]articular facts must be shown in each case to support an officer's reasonable suspicion that exigent circumstances exist.").

¶187 If these facts alone are enough to justify exigent circumstances, then the rule that the State must show "particular facts" to meet its burden is rendered a nullity.

¶188 Beyond the sparse facts I have stated, the State makes no showing of the delay that would have occurred had the police pursued a warrant. Nor does the State make any showing that a delay, had it existed, would have had any impact on the defendant's flight. The State thus failed to show that getting a warrant would "greatly enhance the likelihood of the suspect's escape."[41]

¶189 Instead, using 20/20 hindsight, the lead opinion relies upon the defendant's travel time and location upon arrest to justify its assertion that there was an increased risk of flight.[42] Justice Prosser's lead opinion speculates about where the defendant went and how he could have moved after he began driving.[43] Justice Prosser wonders where the defendant could have gone, listing in great detail the transportation options available in Chicago, then noting that the defendant could have gone elsewhere as well.[44]

¶190 Justice Prosser's lead opinion admits that "the police could only speculate as to [the defendant's] plans or his route". Lead op., ¶80. Justice Prosser's lead opinion then

---

[41] Lead op., ¶79 (citing Hughes, 233 Wis. 2d 280, ¶24) (emphasis added).

[42] Id., ¶¶80-81

[43] Id., ¶80.

[44] Id.

19

speculates about what the police might have speculated——a tenuous chain of reasoning with no basis in fact.

¶191 Thus, Justice Prosser's lead opinion bases its determination that there was a greatly enhanced flight risk upon speculation about speculation, creating its own narrative and ignoring the glaring failure of the State to offer one iota of evidence that increased flight risk existed at all.

B

¶192 Even if we accept that there was some urgent threat created by the defendant's apparent flight with the murder weapon, the State can meet its burden to establish the exigent circumstances exception to the warrant requirement only when "there is compelling need for official action and no time to secure a warrant."[45]

¶193 All warrants necessarily require some amount of time to secure, but the inquiry for exigent circumstances is whether the State can demonstrate specific, articulable facts showing that the warrant process would "significantly increase" the delay before the officers can act.[46]

¶194 Justice Prosser's lead opinion lays out in careful detail the timeline of the events leading up to the defendant's arrest, yet it is missing any evidence about the existence of or length of a delay that would have been caused by obtaining a

---

[45] McNeely, 133 S. Ct. at 1559 (citing Michigan v. Tyler, 436 U.S. 499, 509 (1978)); id. at 1570 (Roberts, C.J., concurring, joined by Breyer, J. & Alito, J.) (same).

[46] Id. at 1561.

warrant or any evidence that such a delay would have adversely affected law enforcement's ability to act to apprehend the suspect.

¶195 Nothing in the record tells us why the officers, who had obtained a warrant for a search of the defendant's residence, could not have obtained a warrant for the defendant's cell phone location data. In other words, there is no reason, based on the record before us, to suppose that it was impracticable for the officers to obtain a search warrant for the defendant's cell phone location data as well.[47]

¶196 The United States Supreme Court has recently informed us once again of the burden of proof the State must meet to fulfill the exigent circumstances exception to a warrant. McNeely, 133 S. Ct. 1552, is instructive.

¶197 In McNeely, the State of Missouri urged that the dissipation of alcohol in the bloodstream created a per se exigent circumstance that created an exception to the warrant requirement for a blood draw. The Court held that such a rule would be contrary to the totality-of-the-circumstances analysis that it has employed in the past and would potentially relieve the state of any burden to show the actual delay created by securing a warrant:

> In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so. See McDonald v. United States, 335 U.S. 451, 456, 69 S. Ct. 191, 93

---

[47] Vale v. Louisiana, 399 U.S. 30, 35 (1970).

21

L.Ed. 153 (1948) ("We cannot . . . excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made [the search] imperative").

.  .  .  .

Consider, for example, a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer. In such a circumstance, there would be no plausible justification for an exception to the warrant requirement.

McNeely, 133 S. Ct. at 1561.

¶198 Thus, the burden on the State in the present case was to show that the situation made the warrantless search in question "imperative" and that securing a warrant "significantly increases" the delay before the officers can take action.

¶199 In the instant case, the record does not include any testimony or evidence demonstrating

- at what time the police decided to seek the defendant's cell phone location data;

- the estimated amount of time needed to obtain a warrant for the data and the duration of any delay; or

- the timeline for obtaining the data absent a warrant, i.e., at what time the law enforcement officer's request was made to the Department of Justice to obtain the cell phone location data; at what time the Department made the request of the cell phone service provider; at what time the cell phone service provider received the Department's request; at what time the

22

cell phone service provider processed the request; and at what time the information was transmitted to Arkansas law enforcement.

¶200 Rather than a clear timeline of the events that demonstrates the need for a warrantless search, the record reveals only the barest of facts. Sometime between 10 a.m. and 12 p.m., while interviewing the defendant's girlfriend, the Kenosha police received the information regarding the defendant's departure in a car. The police stated that their interviews, which finished around 12 p.m., established probable cause to send the temporary "want" to CIB/NCIC "within an hour and a half of obtaining information from the witnesses."

¶201 The record reflects that some time transpired between the time that the "want" was executed with CIB/NCIC and the time that the request for cell phone location data was made to the Wisconsin Department of Justice, which then requested the data from Sprint, the cell phone service provider. The State was not able to pinpoint the relevant times:

[PROSECUTOR]: Prior to contacting the state of Wisconsin agents for assistance, had you received any hits or any feedback or any communication back from CIB or NCIC?

[OFFICER]: No.

[PROESCUTOR]: And you indicate that at a point in time then that you contacted state agents to assist in your investigation to locate the defendant?

[OFFICER]: Yes.

[PROESCUTOR]: Do you recall what time that occurred?

[OFFICER]: I don't know the specific time. It was probably sometime after 12:00 in the afternoon.

23

On cross-examination, defense counsel was not able to get the officer to pinpoint the approximate time frame for the various events:

> [DEFENSE COUNSEL]: And it was after you had received information from [four witnesses] that you put in the information for the Temporary Felony Worksheet, the document submitted to CIB/NCIC?
>
> [OFFICER]: I had not spoken with [one witness] before that was entered. I don't know exactly when the temporary want was entered because, like I said, I didn't do that. But it was after we had gathered enough information to establish probable cause for [the defendant].

¶202 After CIB/NCIC did not respond with any hits, the Kenosha police requested the defendant's location data "sometime after 12:00 p.m." The police received the data from state law enforcement "sometime in the afternoon." The information was not transmitted to Arkansas until 5:37 p.m.

¶203 The record does not show that any additional wait time would have resulted from obtaining a warrant. The record does not show that the time to secure a warrant would have made any demonstrable difference in the time it took to obtain the cell phone location data.

¶204 On the contrary, the law enforcement officers' testimony reveals the efficiency and speed of the existing system to approve warrants. When the police in the instant case sought to obtain a search warrant for the defendant's residence, it took a mere ten to fifteen minutes after the affidavit was completed for a judge to arrive. Within half an hour of the judge's arrival, the search warrant was approved. From the time the police began working on the affidavit for a search warrant

24

for the defendant's residence until the warrant was approved, a maximum of an hour and a half had elapsed.

¶205 On this record, the State cannot meet its burden to demonstrate that the time to secure a warrant would significantly delay, or indeed, delay at all, the disclosure of the defendant's cell phone location data or the apprehension of the defendant.

¶206 In sum, the State failed to carry its burden of proof. Through conjecture and speculation, the lead opinion fills in the many blanks of key facts missing from the record.

¶207 The lead opinion's exigent circumstances exception swallows the rule of the warrant requirement. According to Justice Prosser's lead opinion's reasoning, almost every criminal investigation presents exigent circumstances.

¶208 I decline to undercut the warrant requirement or ignore the heavy burden placed on the State to prove the exigent circumstances exception to the warrant requirement.

VI

¶209 I turn at last to the issue of the defendant's invocation of his right to counsel. The key holding of Miranda v. Arizona[48] was straightforward: "If [an] individual states that he [or she] wants an attorney, the interrogation must cease until an attorney is present."[49]

---

[48] Miranda v. Arizona, 384 U.S. 436 (1966).

[49] Miranda, 834 U.S. at 474.

25

¶210 Justice Prosser's lead opinion requires a suspect to make an "unequivocal invocation" of the right to counsel. This test stems from Davis v. United States, 512 U.S. 452 (1994).

¶211 The Davis "unequivocal" or "unambiguous" invocation test has been heavily criticized on a number of grounds, including that the "unequivocal" test invites equivocation on the part of courts——identical statements appear "unequivocal" to one court but "equivocal" to another.[50] In applying the "unequivocal invocation" test, courts have "rejected as ambiguous an array of statements whose meaning might otherwise be thought plain."[51]

---

[50] Compare United States v. Martin, 664 F.3d 684 (7th Cir. 2011) (invocation was unequivocal when defendant said "I'd rather talk to an attorney first before I do that") with Delashmit v. State, 991 So. 2d 1215 (Miss. 2008) (invocation was equivocal when defendant said "I prefer a lawyer"). Compare also Wood v. Ercole, 644 F.3d 83 (2d Cir. 2011) (invocation was unequivocal when defendant said "I think I should get a lawyer") with Commonwealth v. Morganti, 917 N.E.2d 191 (Mass. 2009) (invocation was equivocal when defendant said he was "thinking I might need a lawyer and want to talk to him before talking to you").

[51] Berghuis v. Thompkins, 560 U.S. 370, 410-11 & n.9 (Sotomayor, J., dissenting). Justice Sotomayor cites a variety of cases in the context of invocations of the Miranda right to remain silent in which courts have applied the test subjectively.

As Marcy Strauss notes in her empirical overview of cases regarding the application of the "unequivocal invocation" rule, courts apply their own subjective spin to a purportedly objective test:

> [T]he evidence suggests gross inconsistencies in the approaches of the courts. Some courts deem seemingly clear demands as ambiguous. Yet in other cases, virtually identical language is treated differently in ways inexplicable by the context. It is drastically unfair that a suspect in one jurisdiction who says, "I

26

¶212 _Davis_ requires a court to make an objectively reasonable analysis of the circumstances to determine whether an individual's request for a lawyer is unequivocal. The defendant need evince only "a certain and present desire to consult with counsel" to invoke the right. _United States v. Hunter_, 708 F.3d 938, 942 (7th Cir. 2013). Courts are required "to evaluate a defendant's request as ordinary people would understand it, and to give a broad, rather than a narrow, interpretation to a defendant's request for counsel." _Hunter_, 708 F.3d at 942 (internal quotation marks and citations omitted).[52]

---

think I would like to talk to my attorney," can be ignored, while a similar statement in another jurisdiction is treated as invoking _Edwards_. It makes no logical sense whatsoever that the police may continue questioning a suspect who says, "Can I call my lawyer?" in one station house, while in another one the comment, "Can I have my lawyer present when [I tell you my story]?" is deemed an invocation of rights requiring the cessation of questions. Such contradictory results are not only unfair, they are pernicious.

Marcy Strauss, _Understanding Davis v. United States_, 40 Loy. L.A. L. Rev. 1011, 1061-62 (2007) (footnotes and citations omitted).

[52] "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." _Davis_, 512 U.S. at 459 (citations & internal quotation marks omitted).

In _United States v. Hunter_, 708 F.3d 938 (7th Cir. 2013), the court held that the defendant's asking "Can you call my attorney?" while giving the officer the name of the attorney constituted an unequivocal invocation of the right to an attorney.

27

¶213 In the instant case, the defendant said, "How can I do to get an attorney here because I don't have enough to afford for one" (emphasis added).

¶214 An ordinary reasonable person, looking at the defendant's statement, would understand the defendant to be making a request for a lawyer. The defendant is saying he cannot afford an attorney and wants to know how to get an attorney at that place and time.

¶215 Justice Prosser's lead opinion ignores the broad interpretation of the defendant's words. Instead, Justice Prosser's lead opinion gives them a narrow interpretation, squinting hard at the record, searching for ambiguity or equivocation where a reasonable person would find none. Lead op., ¶¶86-87.

¶216 Justice Prosser's lead opinion focuses on the discussion of extradition to twist the defendant's request for a lawyer into a request for counsel at the extradition hearing. Lead op., ¶86-87. Justice Prosser's lead opinion claims that the officer had "just explained the extradition process to [the defendant]," which made it reasonable for the officer to infer that "here" meant "at the extradition hearing." Lead op., ¶87.

¶217 Here is what happened: The officer interrogating the defendant described the extradition hearing ("What happens is that you have to appear in front of a judge here in Arkansas then they will find out if there is enough reason to send you back to Kenosha"). But then, the officer added, "But we are not going to do that right now. We are not going to know that right

28

now" (emphasis added).[53]   The officer made clear that the extradition hearing was no longer the subject of conversation.

¶218 It is not objectively reasonable to assume that the defendant used the word "here" to mean anything other than its generally understood definition.  The word "here" is generally intended to mean "in or at this place or time."  A reasonable person would not understand "here" to mean "at some later point in time."  What was happening "here"?  The interrogation.  To a reasonable person, the defendant is saying that he wants a lawyer and wants a lawyer at the interrogation.

¶219 Justice Prosser's lead opinion requires the defendant to speak with the discrimination of an Oxford don[54] and to use an "exact formula" or "magic words"[55] to invoke the right to counsel.  That's not the law.

* * * *

---

[53] The relevant portion of the interrogation was transcribed by the circuit court as follows:

> [POLICE OFFICER]:  We aren't going to take you back to Kenosha.  What happens is that you have to appear in front of a judge . . . .  And after you appear in front of a judge here in Arkansas then they will find out if there is enough reason to send you back to Kenosha, . . . but we are not going to do that right now.  We are not going to know that right now . . . .
>
> [DEFENDANT]:  How can I do to get an attorney here because I don't have enough to afford for one.

[54] Davis, 512 U.S. at 459.

[55] United States v. Lee, 413 F.3d 622, 625 (7th Cir. 2005) ("[T]here is no exact formula or magic words for an accused to invoke his [or her] right.").

29

¶220 In sum, for the reasons stated, I conclude that in the instant case the State failed to meet its burden of demonstrating the existence of exigent circumstances. I further conclude that Subdiaz-Osorio invoked his Miranda right to an attorney at his interrogation.

¶221 For the foregoing reasons and the reasons stated in my dissent in Tate, 2014 WI 89, ¶¶52-165 (Abrahamson, C.J., dissenting), I dissent.